1  Michael A. Hirst (CA Bar No. 131034)
   michael.hirst@hirstlawgroup.com
2  Marisela Bernal (CA Bar No. 329589)
   marisela.bernal@hirstlawgroup.com
3  HIRST LAW GROUP, P.C.
   200 B Street, Suite A
4  Davis, CA 95616
5  Telephone: (530) 756-7700
   Facsimile:  (530) 756-7707
6

**FILED**

**Dec 14, 2022**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

7  D. Maimon Kirschenbaum (NY Bar No. 4387361)
   maimon@jk-llp.com
8  Leah M. Seliger (NY Bar No. 4201224)
   leah@jk-llp.com
9  JOSEPH & KIRSCHENBAUM LLP
   32 Broadway Suite 601
10 New York, NY 10004
   Phone: (212) 688-5640
11 Fax:    (212) 688-2548
12
13 Counsel for Plaintiff-Relator
   William Schaffer

# SEALED

14

15              UNITED STATES DISTRICT COURT

16         FOR THE EASTERN DISTRICT OF CALIFORNIA

17

18 UNITED STATES OF AMERICA, ex rel.        **Civil Action No:**
   WILLIAM SCHAFFER,
19                                              2:22-cv-2209 TLN AC
                    Plaintiffs,
20                                          **COMPLAINT FOR VIOLATION OF**
              v.                            **FEDERAL FALSE CLAIMS ACT**
21
   CARDINAL FINANCIAL COMPANY, LP,         **JURY TRIAL DEMANDED**
22 EQUITY SETTLEMENT SERVICES, INC.,
   HOME QUALIFIED LLC, FRANK               **FILED IN CAMERA AND UNDER SEAL**
23 CAPOBIANCO, SAL RIZZOLO, RALPH          **PURSUANT TO 31 U.S.C. § 3730(b)(2)**
   DIBUGNARA, CHRISTOPHER DELISLE,
24 and DOES 1–10,
25                    Defendants.
26
27        Through his undersigned counsel, *qui tam* Plaintiff-Relator William Schaffer ("Relator"),

28 on behalf of the United States of America in his Complaint against Defendants Cardinal Financial

   Company LP, ("Cardinal"), Equity Settlement Services, Inc. ("Equity"), Home Qualified LLC

                                    1

("Home"), Frank Capobianco ("Capobianco"), Sal Rizzolo ("Rizzolo"), Ralph DiBugnara ("DiBugnara"), and Chris Delisle ("Delisle"), and Doe Defendants 1–10 (unless otherwise indicated, collectively "Defendants"), alleges as follows:

### INTRODUCTION AND OVERVIEW OF THE FRAUD

1.      This is an action to recover damages and civil penalties on behalf of the United States of America (the "United States" or "the Government"). The action arises from false and/or fraudulent statements, records, and claims made and/or caused to be made by the Defendants in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*. ("FCA").

2.      Since at least potentially 2012 through the present, Defendants have knowingly presented and caused to be presented false and fraudulent claims, have knowingly made or used false records and statements material to such claims, have knowingly concealed and avoided repaying the Government for funds wrongfully received through Defendants' fraud, and have knowingly conspired with each other to engage in this fraudulent conduct.  As discussed in greater detail below, Defendants have falsely certified compliance with federal and state laws, while actually and knowingly engaging in conduct that violates those laws. On Government-insured mortgage loans, Defendants have knowingly:

(A) in violation of the Truth in Lending Act ("TILA"), paid and continue to pay illegal incentive payments to mortgage loan originators (loan officers or "LOs");

(B) in violation of TILA, illegally steered borrowers towards more expensive and higher interest loans;

(C) in violation of the Secure and Fair Enforcement for Mortgage Licensing Act ("SAFE Act"), allowed and continue to allow unlicensed LOs to originate loans, and concealed and continue to conceal, the involvement of such unlicensed employees by falsifying the identity of the actual LOs who work on the loans;

(D)  in violation of the Real Estate Settlement Procedures Act ("RESPA"), paid and continue to pay kickbacks to real estate agents and brokers to refer borrowers to Cardinal and tell the borrowers that the loan must be obtained through Cardinal; and

(E) in violation of RESPA, allow Equity, a title company, and Mr. Capobianco, a senior

Complaint

1   vice president at Cardinal, to pay and receive kickbacks to steer all closings to Equity.

2       3.    In addition to the harm caused to the financial interests of borrowers, Defendants'

3   conduct has caused losses to the Government through defaulted loans and Government-insured

4   payments for those loans.  Defendants submit false claims and engage in fraudulent conduct to

5   receive the loan insurance payments to which they know they are not entitled, receive such

6   payments, and fail to notify the Government or repay the wrongfully received funds to the

7   Government.  By submitting and causing the submission of knowingly false claims, and failing to

8   repay the sums wrongfully received, Defendants have caused, and continue to cause, a substantial

9   loss of public funds.

10      4.    Since potentially 2012, Defendants have knowingly failed to comply with material

11  requirements to originate loans, sell or purchase mortgages to Government programs, or receive

12  payments from the Government. Absent such compliance, and through their knowingly fraudulent

13  conduct and schemes, Defendants have repeatedly deceived and defrauded the Government and

14  received funds to which they are not entitled.

15                  **JURISDICTION AND VENUE**

16      5.    This Court has jurisdiction over the subject matter of this action pursuant to 28

17  U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers

18  jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

19      6.    Although the issue is no longer jurisdictional under the 2010 amendments to the

20  FCA, to Relator's knowledge, there has been no statutorily relevant public disclosure of the

21  "allegations or transactions" in this Complaint, as that term is used in 31 U.S.C. § 3730(e).

22  Moreover, whether or not such a disclosure has occurred, Relator qualifies under the FCA as an

23  "original source" of the allegations in this Complaint.  Before filing this action, Relator voluntarily

24  disclosed and provided to the Government the information on which the allegations or transactions

25  in this action are based.  Additionally, Relator has knowledge about the misconduct alleged herein

26  that is independent of, and that would materially add to, any publicly disclosed allegations or

27  transactions that may prove to have occurred without Relator's knowledge.

28      7.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §

Complaint

3

1  3732(a), which authorizes nationwide service of process.  Moreover, venue is proper in this District

2  pursuant to 31 U.S.C. § 3732(a) because one or more Defendants can be found, reside in, or have

3  transacted business in this District that is the subject of this lawsuit.

4  <center>**PARTIES**</center>

5  8.    Plaintiff-Relator William Schaffer ("Schaffer") is a resident of New York, New

6  York.  He was a senior mortgage banker at Loan Lenders of America, and a senior mortgage banker

7  at Northpointe Bank, before he began work at Cardinal in May 2020.

8  9.    Cardinal Financial Company, LP is a limited partnership in the State of

9  Pennsylvania and authorized to conduct business in multiple states. It is headquartered in

10 Charlotte, North Carolina. Cardinal is approved by Federal National Mortgage Association

11 ("FNMA" or "Fannie Mae"), Government National Mortgage Association ("GNMA" or "Ginnie

12 Mae"), Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"), Federal

13 Housing Administration ("FHA"), and Department of Veterans Affairs ("VA") to participate in

14 their mortgage programs.

15 10.    Equity Settlement Services, Inc., is a title company incorporated in the State of New

16 York and authorized to conduct business in multiple states.  It is headquartered in Smithtown, New

17 York.

18 11.    Home Qualified LLC is a limited liability corporation incorporated in the State of

19 New Jersey and authorized to conduct business in multiple states. It is headquartered in Edgewater,

20 New Jersey.

21 12.    Frank Capobianco is a Senior Vice President at Cardinal. Mr. Capobianco is a

22 resident of Smithtown, New York.

23 13.    Sal Rizzolo is a Branch Manager at Cardinal. Mr. Rizzolo is a resident of East

24 Patchogue, New York.

25 14.    Ralph DiBugnara is a Senior Vice President at Cardinal. Mr. DiBugnara is a

26 resident of New Jersey.

27 15.    Christopher Delisle is the owner and CEO of Equity Settlement Services, Inc. Mr.

28 Delisle is a resident of Smithtown, New York.

<center>4</center>

Complaint

16.     The identities of the remaining Doe Defendants who have knowingly submitted, or caused the submission of false and fraudulent claims to the Government, and have knowingly concealed and avoided repaying fraudulently obtained payments to the Government, are presently unknown to the Relator. All listed Defendants and such additional Doe Defendants served as contractors, agents, partners, and/or representatives of one and another in the fraud, concealment, and submission of false and fraudulent claims, as well as the wrongful retention of overpayments, and were acting within the course, scope and authority of such contract, agency, partnership and/or representation for the conduct described herein.  Each of the listed Defendants and Doe Defendants participated in the scheme to defraud the United States, and did defraud the United States, for which the Defendants are jointly and severally liable.

## APPLICABLE LAW

### A.     Federal Mortgage Laws

17.     The Federal TILA, SAFE, RESPA, and the Dodd-Frank legislation impose legal requirements on residential mortgage loan originators. *See* Truth in Lending Act ("TILA"), Pub. L. 90-321, 82 Stat. 146, codified as amended at 15 U.S.C. §§ 1601, *et seq.*; the Secure and Fair Enforcement for Mortgage Licensing Act ("SAFE Act"), 12 U.S.C. §§ 5101, *et seq.*; the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.*; Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), Pub. L. 111-203, 124 Stat. 1376-2223, codified as amended in various sections of Volumes 12 & 15 of the United States Code.

*Law on Loan Officer Incentive Payments and Steering*

18.     TILA defines the term "mortgage originator" as follows:

(A)     [mortgage originator] means any person who, for direct or indirect compensation or gain, or in the expectation of direct or indirect compensation or gain—

> (i)  takes a residential mortgage loan application;
> (ii)  assists a consumer in obtaining or applying to obtain a residential mortgage loan; or
> (iii)  offers or negotiates terms of a residential mortgage loan;

(B)     [mortgage originator] includes any person who represents to the public, through advertising or other means of communicating or providing information (including the use of business cards, stationery, brochures, signs, rate lists, or other

Complaint

promotional items), that such person can or will provide any of the services or perform any of the activities described in subparagraph (A) …

15 U.S.C. § 1602(dd)(2); *see also* 12 C.F.R. § 1026.36(a)(1)(i). One set of standards imposed on mortgage originators restricts compensation. The principal goal of the mortgage originator compensation rules is to separate loan pricing from compensation and thereby eliminate the incentive for originators to place their own financial interests above the interests of consumers.

19.    One such prohibited practice is compensation based on loan terms other than the loan amount: "For any residential mortgage loan, no mortgage originator shall receive from any person and no person shall pay to a mortgage originator, directly or indirectly, compensation that varies based on the terms of the loan (other than the amount of the principal)." 15 U.S.C. § 1639b(c)(1). "Compensation" includes salary, commission, "and any financial or similar incentive." 12 C.F.R. § 1026.36(a)(3). The regulation further prohibits compensation based on a proxy for a term of the transaction. *Id.* at § 1026.36(d)(i). A "term" of the loan is a "right or obligation of the parties to a credit transaction," and a proxy for a term of the loan is a "factor [which] consistently varies with that term over a significant number of transactions, and the loan originator has the ability, directly or indirectly, to add, drop, or change the factor in originating the transaction." *Id.* at § 1026.36(d)(i)–(ii). This provision prohibits compensation based on any interest rates, the annual percentage rate, the type of collateral, *et cetera*.

20.    Also, as specifically applicable herein, the regulations prohibit "steering":

General.  In connection with a consumer credit transaction secured by a dwelling, a loan originator shall not direct or "steer" a consumer to consummate a transaction based on the fact that the originator will receive greater compensation from the creditor in that transaction than in other transactions the originator offered or could have offered to the consumer, unless the consummated transaction is in the consumer's interest.

12 C.F.R. §§ 226.36(e)(1) & 1026.36(e)(1). This separate prohibition is meant to ensure that loan originators advise consumers based on the consumer's interests, such as ability to pay, rather than the originator's potential financial gain from the transaction.

*Law on LO Licensing*

21.    The SAFE Act provides the following:

Complaint

> Subject to the existence of a licensing or registration regime, as the case may be, an individual may not engage in the business of a loan originator without first--
>
> (1) obtaining, and maintaining annually-- (A) a registration as a registered loan originator; or (B) a license and registration as a State-licensed loan originator; and
>
> (2) obtaining a unique identifier.

12 U.S.C. § 5103; *see also* 15 U.S.C. § 1639b(b)(1) (TILA section requiring LOs to obtain licenses). To provide some flexibility to LOs that begin working in another state, the statute also permits for already-licensed loan originators to temporarily act as a loan originator in a different state under limited circumstances:

> Upon becoming employed by a State-licensed mortgage company, an individual who is a registered loan originator shall be deemed to have temporary authority to act as a loan originator in an application State for the period described in paragraph (2) if the individual--
>
> (A) has not had-- (i) an application for a loan originator license denied; or (ii) a loan originator license revoked or suspended in any governmental jurisdiction;
>
> (B) has not been subject to, or served with, a cease and desist order-- (i) in any governmental jurisdiction; or (ii) under section 5113(c) of this title;
>
> (C) has not been convicted of a misdemeanor or felony that would preclude licensure under the law of the application State;
>
> (D) has submitted an application to be a State-licensed loan originator in the application State; and
>
> (E) was registered in the Nationwide Mortgage Licensing System and Registry as a loan originator during the 1-year period preceding the date on which the information required under section 5104(a) of this title is submitted.

12 U.S.C. § 5117(b)(1). However, such authority only lasts until the state license application is approved, denied, or withdrawn -- up to a maximum of 120 days. *Id.* at § 5117(b)(2).

### *Law on Kickbacks to and from Title Companies*

22.     While it has been amended several times since in its original passage in 1974, RESPA was designed to prohibit multiple abusive practices in the real estate industry, including kickbacks and referral fees. *See* Pub. L. 93-533, 88 Stat. 1724. In particular, RESPA prohibits the following:

> (a) Business referrals
>
> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business

7

Complaint

incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

(b) Splitting charges

No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

(c) Fees, salaries, compensation, or other payments

Nothing in this section shall be construed as prohibiting

(1) the payment of a fee (A) to attorneys at law for services actually rendered or (B) by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance or (C) by a lender to its duly appointed agent for services actually performed in the making of a loan,

(2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed,

(3) payments pursuant to cooperative brokerage and referral arrangements or agreements between real estate agents and brokers,

(4) affiliated business arrangements so long as (A) a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred …

12 U.S.C. § 2607(a)–(c). In other words, Congress wished to eliminate incentives paid to third-parties on a per-referral basis.

23.    In addition, HUD and the CFPB promulgated Regulation X to elaborate on RESPA enforcement. Regulation X defines "settlement service" as any of the following:

(1) Origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of such loans);

(2) Rendering of services by a mortgage broker (including counseling, taking of applications, obtaining verifications and appraisals, and other loan processing and origination services, and communicating with the borrower and lender);

(3) Provision of any services related to the origination, processing or funding of a federally related mortgage loan;

(4) Provision of title services, including title searches, title examinations, abstract preparation, insurability determinations, and the issuance of title commitments and title insurance policies;

…

8

(7) Rendering of credit reports and appraisals;

…

(9) Conducting of settlement by a settlement agent and any related services;

…

(14) Rendering of services by a real estate agent or real estate broker; and

(15) Provision of any other services for which a settlement service provider requires a borrower or seller to pay.

12 C.F.R. § 1024.2. Regulation X also prohibits against kickbacks for settlement services:

(b) No referral fees. No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person. Any referral of a settlement service is not a compensable service, except as set forth in § 1024.14(g)(1). A company may not pay any other company or the employees of any other company for the referral of settlement service business.

(c) No split of charges except for actual services performed. No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed. A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section. The source of the payment does not determine whether or not a service is compensable. Nor may the prohibitions of this part be avoided by creating an arrangement wherein the purchaser of services splits the fee.

12 C.F.R. § 1024.14(b)–(c).

**B.    Federal Mortgage Programs**

24.    Cardinal is an approved participant in each of the following federal mortgage programs.

25.    The United States Department of Veterans Affairs ("VA") is a federal agency that guarantees mortgages for veterans and surviving spouses. *See* 38 U.S.C. §§ 3701, *et seq.* The VA provides certain unsupervised lenders with automatic authority, which permits the lender to originate most VA loans without underwriting review by the VA. To originate a loan without automatic authority or to apply for automatic authority, lenders must certify that they have complied with all applicable laws and regulations. 38 C.F.R. § 36.4340(k)(1); Dep't of Veterans Affairs, *VA Pamphlet 26-7, Lenders Handbook* § 1.5(e). The VA imposes civil monetary penalties

9

Complaint

1  and sanctions on any lender that knowingly and willfully makes a false certification to the VA. 38

2  U.S.C. § 3710(g)(4)(A); 38 C.F.R. § 36.4340(k)(3); Dep't of Veterans Affairs, *VA Pamphlet 26-*

3  *7, Lenders Handbook* §17.02.

4      26.    The Federal Housing Administration ("FHA") is a federal agency and part of the

5  United States Department of Housing and Urban Development ("HUD").  Among other things,

6  the FHA insures mortgages originated by approved lenders. *See* 12 U.S.C. §§ 1707, *et seq.*

7  Approved lenders must certify that they are in compliance with all applicable laws and regulations.

8  *See* 24 C.F.R. § 202.5; HUD Handbook 4000.1, FHA Single Family Housing Policy Handbook at

9  § II.A.1.a.ii.B. Approved loan originators must make annual certifications that they continue to

10  comply with mortgage origination laws and regulations.  *See* HUD Handbook 4000.1, FHA Single

11  Family Housing Policy Handbook at § I.A.8. The HUD imposes civil penalties on approved

12  lenders if they commit any of the following violations:

13      (F)  Falsely certifying to the Secretary [of the HUD] or submitting to the Secretary
        a false certification by another person or entity.

14
15      (G)  Failure to comply with an agreement, certification, or condition of approval
        set forth on, or applicable to—

16      (i)  the application of a mortgagee or lender for approval by the Secretary….

17      (H)  Violation of any provisions of title I or II of this Act [12 U.S.C. §§ 1702 et
        seq. or 1707 et seq.], or any implementing regulation, handbook, or mortgagee letter
18      that is issued under this Act.

19  12 U.S.C. § 1735f-14(b)(1). Each mortgage application is considered a separate violation. 24

20  C.F.R. § 30.35(c)(1). In addition, the federal Government imposes criminal penalties

21  (imprisonment and/or fines) for false statements made to the HUD or FHA for the purposes of

22  obtaining a loan or advance of credit. *See* 18 U.S.C. § 1010.

23      27.    The United States Department of Agriculture ("USDA") is a federal agency that

24  provides a 90% loan note guarantee to approved lenders who originate mortgages in certain rural

25  areas for the USDA's Rural Development program. *See* 42 U.S.C. §§ 1471, *et seq.*; 7 C.F.R. §§

26  3555.1, *et seq.* The USDA only permits approved lenders to originate loans for this program, and

27  the lenders must certify that they will comply with all applicable laws and regulations. 7 C.F.R.

28  §§ 3555.6 & 3555.51. The USDA is authorized to impose penalties on lenders that violate any

Complaint

program requirements. *Id.* §§ 3555.9, 3555.108(d), 3555.355.

28.    The Government National Mortgage Association, or "Ginnie Mae" ("GNMA"), is a public corporation owned by the HUD. *See generally* 12 U.S.C. § 1721; 24 C.F.R. §§ 300–350. GNMA is the guarantor for all government-insured loans (including VA, FHA, and USDA loans) and is backed by the full faith and credit of the United States. 24 C.F.R. §§ 300.3 & 320.13. GNMA approves third party issuers to originate mortgages, package or pool them into securities, and then sell the packages on the secondary market. An approved issuer must be an FHA-approved lender, and failure to comply with FHA rules and regulations disqualifies the issuer. *Id.* at §§ 320.3(a)(1) & (d). GNMA is authorized to impose civil penalties on issuers that commit the following statutory violations:

> (G)   Submission to the [Government National Mortgage] Association of false information in connection with any securities guaranteed, or mortgages pooled, under section 306(g) [12 U.S.C. § 1721(g)].
>
> …
>
> (I)   Submission to the Association of a false certification either on its own behalf or on behalf of another person or entity.
>
> (J)   Failure to comply with an agreement, certification, or condition of approval set forth on, or applicable to, the application for approval as an issuer of securities under section 306(g) [12 U.S.C. § 1721(g)].
>
> (K)   Violation of any provisions of this title [12 U.S.C. §§ 1716, *et seq.*] or any implementing regulation, handbook, or participant letter issued under authority of this title [12 U.S.C. §§ 1716, *et seq.*].

12 U.S.C. § 1723i(b)(1). Each violation is considered a separate violation for each pool of mortgages. 24 C.F.R. § 30.50(b).

29.    The Federal National Mortgage Association, or "Fannie Mae" ("FNMA"), is a government-sponsored enterprise under the conservatorship of the Federal Housing Finance Agency ("FHFA"). *See* 12 U.S.C. § 1719; 12 C.F.R. § 1200.1. FNMA purchases mortgages on the secondary market to stabilize the industry and provide liquidity. FNMA requires that an entity apply to become an approved originator, seller, lender, etc., before it will do any business with the entity. Approved entities must certify that they are in compliance with all applicable laws and regulations regarding mortgage origination. *See* Fannie Mae Seller's Guide § A3-2-01. Approved

Complaint

1   entities must make annual certifications that they continue to comply with mortgage laws and

2   regulations. *Id.* at § A4-2-02. If a mortgage originator fails to comply with any requirements,

3   FNMA may suspend or terminate the entirety of a contract to purchase loans from the approved

4   originator. *Id.* at § A2-3.1-02. FNMA may also elect to force a mortgage originator to repurchase

5   loans. *Id.* at § A2-3.2-01.

6       30.     The Federal Home Loan Mortgage Corporation ("FHLMC") is a government-

7   sponsored enterprise under the conservatorship of the FHFA. *See* 12 U.S.C. § 1452; 12 C.F.R. §

8   1200.1. FHLMC purchases mortgages on the secondary market to stabilize the industry and

9   provide liquidity. FHLMC requires that entities apply to become approved originators, sellers,

10  lenders, etc., before it will do any business with the entities. As part of the application process,

11  entities must certify that they are in compliance with all applicable laws and regulations regarding

12  mortgage origination. *See* Freddie Mac Single-Family Seller/Servicer Guide § 4202.1. Approved

13  entities must make annual certifications that they continue to comply with mortgage laws and

14  regulations. *Id.* at §§ 2101.10-11. If a mortgage originator fails to comply with requirements,

15  FHLMC may disqualify or suspend a lender for material misstatements or misrepresentations on

16  any application or certification. *Id.* at §§ 2301.2(a)(16) & 3601.1. FHLMC may also elect to force

17  a mortgage originator to repurchase loans. *Id.* at § 3601.1.

18  **C.     False Claims Act**

19      31.     The Federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(l), provides for the

20  imposition of treble damages and civil penalties against a defendant who, inter alia, submits to the

21  United States a false or fraudulent claim for payment. When submitting a claim for payment,

22  Defendants do so subject to and under the terms of federal law, including, for example, TILA,

23  SAFE, RESPA, the Dodd-Frank Act, and related regulations, such as Regulation Z, 12 C.F.R. §

24  1026, *et seq.*

25      32.     Federal mortgage programs require certification of compliance with these laws as

26  a material condition of both participation in the programs and receipt of payment, and claims that

27  violate these requirements are false or fraudulent claims under the FCA.  The Federal Mortgage

28  Programs, discussed above, and their fiscal agents will not pay claims for mortgage defaults nor

Complaint

purchase mortgages on the secondary market if the mortgage originator does not qualify for the program or if mortgages were originated in violation of law.

33.    The FCA, as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21 ("FERA") enacted May 20, 2009, provides, in relevant part:

> Liability for Certain Acts. (1) In General – Subject to paragraph (2), any person who –(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B)…or (G). . .; or (G) knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States for a civil penalty of not less than [currently $12,537] and not more than [currently $25,076] . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1). The FCA further provides:

> Actions by Private Persons. (1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government.

31 U.S.C. § 3730(b)(1).

## THE FRAUD SCHEME

34.    Defendants have engaged and continue to engage in a pattern and practice of fraudulently certifying that they comply with TILA, SAFE, RESPA, Dodd-Frank, and related statutes and regulations so that they can participate in the above mortgage programs and receive Government funds. Instead of complying with those legal requirements, however, Defendants knowingly engage in the following fraudulent and illegal conduct.

*Loan Officer Compensation*

35.    Defendants knowingly fail to comply with the mortgage originator compensation requirements discussed above, and hide their non-compliance by falsifying records and submitting untrue certifications so that federal auditors will not discover the fraud.

36.    Defendants have knowingly, and in violation of the law, devised a scheme to tie loan officer compensation to the interest rates on mortgages originated by the LOs, thereby incentivizing LOs to steer borrowers to high interest loans, and high fee loans, to increase the LOs'

Complaint

compensation and similarly increase Defendants' profits. The scheme is designed to avoid detection by borrowers or auditors by attributing the different interest rates to the supposed "lead source." Defendants have thus implemented a compensation plan that encourages LOs to falsify the lead source in steering borrowers to loans that are not in the borrowers' best interests. As a result, borrowers pay excessive amounts to secure and maintain their loans, putting borrowers in a risky financial condition, and requiring the Government to sustain losses when the homeowners subsequently default in foreclosure.

37.     In essence, Cardinal's LO compensation scheme makes "lead sources" serve as a hidden proxy for interest rates and fees. Although it is not a common compensation structure, in a legitimate lead source arrangement, LO bonuses would vary based on the actual origin of a borrower. Thus, an LO could receive a pre-determined bonus when a referral is made by a friend or colleague, and a different pre-determined bonus when a borrower calls the telephone number printed on a marketing mailer. That is not the practice at Cardinal. Instead, Cardinal pays different bonus rates to LOs based on their ability to steer borrowers to high interest loans and fees, and hides the payments through a selection of "lead source" options that have nothing to do with the source of the borrower's contact with Cardinal.

38.     Cardinal uses the "Octane" program, a proprietary system, for the loan origination process, including creating the loan application, submitting the application and supporting documents for underwriting approval, and generating loan paperwork. The "lead source" option in Octane is used to change the range of interest rates and fees for a loan. The higher interest rates and fees that an LO is able to charge a borrower, the higher the lead source bonuses paid to the LO. Cardinal's false identification of a lead source as "Aged" versus "Real Time," for example, simply provides additional compensation to the LO handling that loan.

39.     Most borrowers contact Cardinal because of either networking referrals or misleading mailers that offer low interest rates that are not actually available to borrowers. However, Defendants permit LOs to choose the "lead source" option in Octane regardless of the true lead source for each borrower. Despite the actual lead source (whether though a mailer, referral, etc.), if the LO can sell a borrower on a loan with a high interest rate, the LO will select

Complaint

the lead source that corresponds to that high rate. The LO will then receive compensation based on the high interest rate, through the purported "lead source" selection and payment.

40.     For example, on October 29, 2021, Relator Schaffer texted Branch Manager Sal Rizzolo to inquire about a bonus for a particular loan. Mr. Rizzolo responded that the loan was not very profitable and compared it to another loan that Mr. Rizzolo had switched from the "Real Time" lead source to an "Aged" lead source, so that Mr. Schaffer "got paid about 4-5000 more." *October 29, 2021 text messages from Sal Rizzo and William Schaffer* (Exhibit A).

41.     In another text message on May 5, 2021 between Relator Shaffer and his branch manager Mr. Rizzo, Mr. Rizzo wrote that the bonus for Relator would be 1.75% of the loan amount (175 basis points) "if you hit Aged full boat," meaning that amount in bonus would be paid to the Relator if he was able to get the borrower to agree to a loan at that interest level. *Text messages from Sal Rizzo and William Schaffer* (Exhibit B).

42.     The true lead source for a loan is not documented in Octane, but rather in routine "new setup" e-mails from LOs to Cardinal management for each loan they originate. Cardinal management also periodically overrides Octane to modify a lead source if a borrower presses for a lower interest rate than the rate initially offered by the LO. Those overrides are documented in Octane's "activity history" log.

43.     Cardinal's unlawful LO compensation structure incentivizes LOs to steer borrowers -- particularly unsophisticated, minority, and/or low-income borrowers -- to loans with higher interest rates and closing costs, and thus loans which are more likely to default. Frank Capobianco (Senior Vice-President, Retail Division) reports recently originated loans in the division's group chat to incentivize other LOs to negotiate aggressively. Cardinal management also sends out periodic leaderboards to highlight LOs with the highest volume and value of loans.

44.     Cardinal's offer of employment to Relator Schaffer, and its discussion of compensation, references the lead source scheme. In the letter, Cardinal states:

> Cardinal shall pay Employee a commission bonus (the "Employee Funding Incentive Commission Bonus") on each loan for which Employee is listed as the loan originator at time of disbursement of funds to the borrower ("Funded Loan") ...

Complaint

The Employee Funding Incentive Commission Bonus shall be calculated by determining the aggregate of all fixed incentive percentages on each Funded Loan (the "Fixed Incentive Percentage") for each pay cycle. The Fixed Incentive Percentage shall be calculated by multiplying the amount of the Funded Loan by the basis points ("bps") (where one bps equals 1/100th of one percent) of the applicable lead source in the table below.

| Lead/Loan | Bps | Maximum Commission |
|---|---|---|
| Self-Gen* | 75 | $7,500.00 |
| Real Time | 125 | $7,500.00 |
| Media | 150 | $7,500.00 |
| Aged | 175 | $7,500.00 |
| Brokered Loan**, irrespective of lead source | 50 | $7,500.00 |
| Recapture***, irrespective of lead source | N/A | N/A |

*A "Self-Generated Loan" means a loan which is (a) identified by Cardinal as sourced through a self-generated campaign source; (b) is either (i) not contained in Cardinal's marketing database; or (ii) is contained in Cardinal's marketing database as a lead for a period of 120 days or more prior to the rate lock of such loan, including but not limited to customers whose names were associated with existing consumer pre-screened trigger leads as defined in the federal Fair Credit Reporting Act, payoff requests or customer inquiries regarding a loan or application for a loan; and (c) if a refinance loan application from a loan in which Cardinal originated, one in which the borrower has made four (4) consecutive payments on the subject loan prior to acceptance of the application for the refinanced loan.

**Brokered, - A loan that is brokered by Employee on behalf of Cardinal for another lender

***Recapture -A loan in which the borrower of the Funded Loan (i) is a borrower on another loan currently owned or serviced by Cardinal at the time of the New Loan; and (ii) the Funded Loan is a re-financed loan used to pay off a loan currently owned or serviced by Cardinal at the time of the New Loan.

If Cardinal offers the same loan product as a Brokered Loan brokered by Employee, such Brokered Loan shall be multiplied by the same amount as the Cardinal Supplied Lead.

*May 14, 2020 Offer of Employment with Cardinal Financial Letter to William Schaffer, Exhibit A - Compensation Addendum, at 3–5 (Exhibit C).*

45.     In fact, Relator Schaffer and the other LOs' "Incentive Commission Bonus" is not based on "fixed incentive percentages." Instead, the bonus payment to LOs varies and is based on the ability of the LOs to steer borrowers to high interest, high fees loans: the higher the interest

Complaint

1   and fees, the more profit for Cardinal, the worse for the borrowers, and the more risky for the

2   Government, because the Government-insured loans are more likely to, and do, result in defaults.

3   That is why Congress has prohibited this practice. *See, e.g.*, 15 U.S.C. § 1639b(c)(1) ("For any

4   residential mortgage loan, no mortgage originator shall receive from any person and no person

5   shall pay to a mortgage originator, directly or indirectly, compensation that varies based on the

6   terms of the loan (other than the amount of the principal).").

7       46.    Cardinal knows that its conduct in paying such bonuses to LOs is illegal and results

8   in harm to borrowers, but Cardinal doesn't care enough to stop that conduct. Indeed, the harm to

9   borrowers is treated as a joke, even by senior management.

10       47.    For example, in or about June 2021, Mr. Capobianco, a Senior Vice President,

11   texted Michael Braunstein, a Branch Manager, and asked what was going to happen to the

12   borrowers with 50 or 55 percent debt-to-income ratio ("DTI's") when property values are

13   reassessed and real estate taxes "go up by 30/50% next year?" Mr. Braunstein responded: "They

14   don't check DTI's once you foreclose[.]" A Cardinal employee responded with an emoji of a

15   laughing face. *See* Exhibit D, text message (attached hereto).

16       48.    Cardinal violated TILA and Regulation G by making payments to loan originators

17   that incentivized LOs to steer borrowers to loan terms that financially benefitted Cardinal and the

18   LOs. 15 U.S.C. § 1639b(c)(1).; 12 C.F.R. § 1026.36(d)–(e). If the government had been aware of

19   Cardinal's practices, it would not have insured those loans.

20   <center>*Unlicensed Loan Officers*</center>

21       49.    Cardinal employs unlicensed LOs. To hide this fact, Cardinal substitutes the name

22   of a licensed LO for the name of each unlicensed LO who actually generates a loan. Generally,

23   LOs may originate loans for borrowers and properties only in states in which the LO is licensed.

24   *See* 12 U.S.C. § 5103(a)(1)(B). However, Defendants enable unlicensed "surrogates" to originate

25   loans in Octane under another LO's name, so that only the licensed LO appears on the loan

26   documents.

27       50.    The unlicensed surrogate is listed in Octane, but not his or her role in the loan

28   origination. Thus, a Government auditor would have no context to realize that the unlicensed

<center>17</center>

Complaint

surrogate is actually the true LO that did all of the work to originate the loan.

51.    Unlicensed employees at each Cardinal regional division use this method to complete loans in any state, as long as they can find and use another LO's state license. The licensed LOs receive a small bonus for the use of their names and licenses for each completed loan, while the unlicensed surrogates receive the bulk of the bonuses. Octane data, e-mails, and text messages will demonstrate this scheme.

52.    For example, on December 2, 2020, Relator communicated with Mr. Capobianco via e-mail. Mr. Schaffer, who did not have a valid license for a loan, asked about whether he could receive compensation for the loan before his state license was approved. Mr. Capobianco stated that none of the loans would have closed in Relator's name, confirming that Mr. Schaffer had started the loan in the name of another LO. Mr. Capobianco then confirmed that Cardinal would have to use a work-around for Relator's payroll as they had done since he was hired.

53.    Cardinal violated the SAFE Act by knowingly allowing unlicensed LO employees to originate loans without first obtaining a loan originator license in the required state. *See* 12 U.S.C. § 5103(a)(1)(B). In addition, Cardinal's practices routinely exceed the 4-month grace period provided to already-licensed loan originators while their applications are pending in new states. *See id.* §§ 5117(b)(1) & (b)(2). For example, Cardinal had Relator originating loans in states in which he was not licensed in December 2020 despite hiring him in May 2020.

*Kickbacks to Real Estate Agents and to Mr. Capobianco*

54.    Cardinal illegally pays kickbacks to real estate agents and brokers to generate additional loans. Several real estate agents, including Michael Foley and Josh Handler, are employed by Cardinal as "Business Development Specialists," but the agents also work for real estate entities. The sole reason for their "employment" at Cardinal is to refer borrowers to Cardinal as a requirement for the borrowers to complete the property transactions. The real estate agents' "salaries" are adjusted every few months to reflect the number and value of their referrals. Beyond these salaries, Mr. Rizzolo and Branch Managers John Lopresti and Michael Giancola arrange cash payments to the agents and brokers to supplement their salaries based on their monthly performances in referring borrowers to Cardinal.

Complaint

55.     On numerous occasions, Mr. Handler has admitted to the Relator that he is paid for his referrals to Cardinal, and that he receives cash in addition to his salary. Mr. Handler told Relator that he believed his "bullshit" title from Cardinal was "a good workaround" to get the payments.

56.     Cardinal violated RESPA and Regulation X by making payments to Mr. Handler that were contingent upon the referral of borrowers to Cardinal. 12 U.S.C. § 2607(a)–(b); 12 C.F.R. § 1024.14(b)–(c). The employer-employee relationship was a farce intended to obscure the nature of the illegal kickbacks and to prevent detection that Mr. Handler was steering his clients to Cardinal.

57.     In addition, Mr. Capobianco receives substantial kickbacks from Equity Settlement Services, a title company. The kickbacks are paid by Equity's owner and president, Christopher Delisle. As a result of those kickbacks, the employees who work under Mr. Capobianco in the states in which Equity Settlement Services works are required to steer all loan closings to Equity. Mr. Capobianco then launders the kickbacks he has received by, for example, loaning Mr. Rizzolo cash that is subsequently repaid to hide the source of the initial funding. Mr. Capobianco receives between $200 and $300 per referral, and because thousands of such referrals are made, Mr. Capobianco has received millions of dollars in kickbacks.

58.     Within a few months after he began work at Cardinal, the Relator lived with Mr. Rizzolo and rented a room in his house from August 2020 until February 2021. In or around October of 2020, the Relator was present when Mr. Capobianco gave Mr. Rizzolo approximately $200,000 as a loan in cash so that Mr. Rizzolo could add a swimming pool to the home. During the conversation at that time, both Mr. Capobianco and Mr. Rizzolo told the Relator that Mr. Capobianco had this money available because he receives kickbacks from the title company for inflating the title fees and title insurance fees charged to borrowers. Thus, the borrowers pay more than they should in title fees, so that Equity has money available to kickback to Mr.

59.     Mr. Capobianco and Equity Settlement Services both violated RESPA and Regulation X by participating in the scheme through which Equity paid cash to Mr. Capobianco in exchange for requiring his Cardinal employees to refer Cardinal's borrowers to Equity. 12 U.S.C. § 2607(a)–(b); 12 C.F.R. § 1024.14(b)–(c).

Complaint

60.    In addition, Cardinal paid kickbacks to realtors using Home Qualified LLC as an intermediary for the payments. Home Qualified LLC was founded by Ralph DiBugnara, one of Cardinal's Senior Vice Presidents and a Partner of Mr. Capobianco. Cardinal had no legitimate reason to pay fees to Home Qualified LLC. The purpose of those payments was to forward kickbacks to realtors, and to disguise that the payments came from Cardinal.

61.    In November and December 2020, Relator worked out of Mr. DiBugnara's office in Edgewater, New Jersey, and participated in meetings with realtors. During those meetings, Mr. DiBugnara pitched Cardinal to the realtors and claimed that an added benefit of working with Cardinal was the opportunity for referral fees. Mr. DiBugnara then negotiated the payment amount for the referral fees. Some realtors were paid flat amounts, while others received percentage points. Mr. DiBugnara later expressly confirmed to Relator that Cardinal paid some of the real estate agents and they want to maintain those relationships, so Relator needed to "get those deals closed."

62.    Cardinal, DiBugnara, and Home Qualified LLC all violated RESPA and Regulation X by participating in the scheme through which Cardinal paid illegal fees to Mr. DiBugnara and Home Qualified LLC, which in turn paid kickbacks to realtors in exchange for referrals to Cardinal. 12 U.S.C. § 2607(a)–(b); 12 C.F.R. § 1024.14(b)–(c).

*Complaining about the fraud*

63.    The Relator worked directly with Mr. Capobianco until July 2021. At that time, someone called Cardinal, spoke to the Relator, said he was from the Consumer Fraud Protection Bureau, and then hung up. The Relator was very concerned and asked to meet with Mr. Capobianco. He was denied the meeting. Relator then called Mr. Capobianco, and told him that people knew about the fraud. Mr. Capobianco said words to the effect that: "Don't worry about it," "We know the government isn't interested," "Just put your head down," and "You're worried about the wrong things."

64.    The Relator was unhappy about his conversation with Mr. Capobianco, and the lack of concern regarding the fraudulent conduct that the Relator had observed. After the call, the Relator talked with Jay Christiano about the conversation he had with Mr. Capobianco. He told Mr. Christiano that Mr. Capobianco was exposing everyone to liability, and that the fraud at

Complaint

1  Cardinal was both inappropriate and unnecessary because business was fine without the illegal

2  behavior.

3       65.    The day after the phone call with Mr. Capobianco, the Relator was transferred to

4  Mr. Rizzolo's branch and his supervision. The Relator became cut off from new leads, and his

5  income dropped substantially. In a Google Hangouts conversation with Mr. Capobianco, the

6  Relator asked him if he had cut off the Relator from new leads. Mr. Capobianco answered "yes,"

7  without providing any explanation.

8              *Resulting Defaults for Government-Insured Mortgages*

9       66.    Defendants' fraud schemes increase Cardinal's profits, LO compensation, and

10  third-party compensation at the expense of the Government, which either purchases, insures, or

11  subsidizes loans that are more likely to default because of Defendants' fraud.

12       67.    Attached as Exhibit E is a Neighborhood Watch Early Warning Report for Cardinal.

13  Exhibit E demonstrates the current default rates for loans originated by specific Cardinal branches,

14  sorted by those with the highest percentage of "Seriously Delinquent" claims.

15       68.    Cardinal knowingly lures financially strained borrowers into high interest, high

16  risk re-finances and mortgages and then sells those loans to Dovenmuehle Mortgage Inc.

17  ("Dovenmuehle"), so that Cardinal does not have to deal with the foreseeable foreclosures. Even

18  though Cardinal routinely sells such mortgages to Dovenmuehle, many Cardinal branches have

19  "Seriously Delinquent" claim rates higher than 10%.

20              **RELATOR'S EMPLOYMENT CLAIMS**

21       69.    At times during his employment at Cardinal, Relator reported directly to Mr.

22  Capobianco.

23       70.    Cardinal's Senior Vice Presidents, such as Mr. Capobianco, generally supervise 15

24  to 20 branch managers, who each supervise a team of 20 or more employees made up of loan

25  originators and loan processors. Unlike most other Vice Presidents at Cardinal, Mr. Capobianco

26  supervised a team of branch managers in the Northeast region and also acted as a branch manager

27  himself, directly supervising his own team of loan originators and loan processors.

28       71.    On Mr. Capobianco's individual team, there were only two employees who are

Complaint

1  people of color, both women. Upon information and belief, people of color represent a very small
2  minority of the employees in the Northeast region directed by Mr. Capobianco.

3  72.   While employed by Cardinal, approximately 70 percent of Relator's overall
4  business, and approximately 90 percent of Relator's business resulting from the Company's direct
5  mail campaigns, consisted of FHA mortgages. FHA mortgages are insured by the U.S. government
6  and can only be issued by an approved lender that has certified to its compliance with various laws
7  – including various anti-discrimination laws.

8  73.   As discussed above, loan originators on Mr. Capobianco's team are encouraged to
9  engage in illegal lending practices, including illegal discrimination, to increase profits for the loan
10  originators, often to the detriment of the borrowers.

11  74.   Relator observed that at Cardinal, loans with unnecessarily high interest rates were
12  consistently offered and sold to racial minorities more frequently than non-minority customers.

13  75.   Charging racial or ethnic minorities higher interest rates than non-minority
14  borrowers violates FHA laws and regulations, as well as relevant anti-discrimination regulations
15  issued by the U.S. Department of Housing and Urban Development ("HUD").

16  76.   Further, Relator observed that Cardinal's marketing strategies were racist. The
17  direct mail and other solicitations distributed by Cardinal targeted lower income and minority
18  areas. These solicitations promised low-interest-rate loans, or FHA loans, to individuals regardless
19  of credit, income or other typical barriers. Thus, the majority of the potential customers that
20  responded to Cardinal's advertisements were minorities and low-income customers.

21  77.   Over time, Relator discovered that the low income and minority customers
22  generated from Cardinal's direct mailings were consistently charged higher interest rates than non-
23  minority clients.

24  78.   In part to prevent its racist and discriminatory lending practices from being
25  discovered, Cardinal developed a convoluted loan application and loan originator compensation
26  structure.

27  79.   This compensation structure, called the "Employee Funding Incentive Commission
28  Bonus" program, is described above.

22

Complaint

80.    In addition, Mr. Capobianco instructed loan originators on his team, including Relator, not to ask the race of their loan clients and to indicate on loan applications that the clients refused to provide the information. In this way, the disparate treatment of minorities by the Company cannot be easily tracked. Mr. Capobianco's instructions were a direct violation of the record-keeping mandates applicable to loan originators under the FHA.

81.    In or about October of 2020, Relator spoke with Mr. Capobianco about the way customer lead sources were inaccurately recorded, stating that it was unlawful and subjected the Company to legal liability.

82.    Mr. Capobianco explained that the evidence of this wrongful practice gets obscured by a Company accountant who methodically edits the recorded lead sources after each mortgage is funded.

83.    In addition to the racially discriminatory loan practices, Relator observed a racially discriminatory work environment encouraged by Mr. Capobianco.

84.    For example, all members of the Northeast region team, including branch managers, underwriting managers, compliance managers, loan originators, loan processors, Senior Vice President Marc Sottile and other Vice Presidents, were on an intraoffice chat group. On this chat, Mr. Capobianco and others frequently posted racist and racial memes and used racist language including the "n" word. Sometimes these racist posts made fun of the two women of color on Relator's team and racial minorities in general.

85.    One image posted on the interoffice chat by Mr. Capobianco included a picture of a random young couple, a white man and black woman, standing together. Mr. Capobianco joked that the picture depicted a white employee, Michael Giancola, and one of the few Black employees on his team, Danielle Parker.

Complaint



86.    Several other posts by Mr. Capobianco included a cartoon image of a Middle Eastern princess (Jasmine from the Disney movie Aladdin) and another picture of an indigenous young woman from South America, which he said depicted an employee named Sonia, the one woman on the team who was of Middle Eastern or Indian descent.



87.    Relator, who is white, became increasingly disturbed by the racially discriminatory comments and business practices he observed. He hesitated to speak up initially due to the intensely coercive culture cultivated on Mr. Capobianco's team.

Complaint

88.    Mr. Capobianco made clear to Relator, from the time of their first in-person meeting, that he "destroys the lives" of people who speak out against him. Mr. Capobianco told Relator stories of how he did this to people who had complained about him in the past.

89.    Shocked by the absolute silence of everyone on the team in response to Mr. Capobianco's racist comments on the interoffice chat, Relator asked a fellow loan originator, Jay Christiano, how it was possible that nobody had sued Mr. Capobianco for his racist comments and posts. Mr. Christiano responded that "Nobody would mess with Frank – and he doesn't give a f—k." Relator told Mr. Christiano that these practices were deeply disturbing to him, but did not initially report the problem to Mr. Capobianco.

90.    As Relator witnessed clients, particularly clients from ethnic and racial minorities, getting harmed by the Company's lending practices, he became increasingly dismayed with his employer. He believed that the Company would remain highly profitable even if it abandoned the predatory and illegal lending practices.

91.    Relator's frustration was compounded by the atmosphere of intimidation and fear that prevented employees from objecting to the internal racist banter and the treatment of clients.

92.    Over time, Relator became depressed and severely anxious because of the intensely racist environment and the unethical and racist loan practices encouraged by the Company. He feared losing his job if he complained, but his conscience prevented him from turning a blind eye to what he saw.

93.    In or about January of 2021, Relator took a three-week leave of absence to address the symptoms of his depression.

94.    Relator returned to work in or about February of 2021.

95.    When he returned to work, Mr. Capobianco assigned one of the other loan originators, Mr. Christiano, to observe him and allegedly provide Relator with emotional support. In reality, Mr. Christiano was tasked with determining whether Relator intended to report the unlawful, racist, and fraudulent business practices at the Company.

96.    Relator did in fact confide in Mr. Christiano that the racist environment and unlawful loan practices in the group were extremely disturbing to him.

Complaint

97.    Mr. Christiano told Relator, "Don't think like that. Just put your head down and do the work."

98.    However, having just returned from therapy during his leave, Relator felt he could not just put his head down and work in such an environment without it further injuring his mental health.

99.    Thus, in or about June of 2021, Relator called Mr. Capobianco and complained about what he had observed. Relator complained about the racist communications on the intraoffice chat and in the office. He also complained about the discriminatory and fraudulent treatment of customers. Relator suggested that the group did not need to employ these tactics to remain profitable and that doing so exposed Cardinal to legal liability.

100.    In response, Mr. Capobianco stated that nobody in Cardinal cared about the racial "jokes" and that nobody would "fuck with me" regarding the fraudulent and discriminatory loan practices.

101.    The very next day after the Relator's complaint, Mr. Capobianco cut Relator off from all leads coming in from Cardinal's marketing efforts. Relator's phone stopped ringing immediately. When Relator questioned Mr. Capobianco if he had disconnected Relator from receiving the customer leads, Mr. Capobianco confirmed that he had and instructed Relator to generate his own leads moving forward.

102.    Thus, within days of making a complaint about discrimination and fraud, Mr. Capobianco directly caused Relator's business and income to shrivel to a fraction of what it had been before he complained.

103.    On the same day that Relator was cut off from his main source of business, Mr. Capobianco also transferred Relator to another team led by Mr. Rizzolo. Relator remained blocked from all incoming customer leads, and on Mr. Rizzolo's team, the unethical compensation and fraudulent loan practices were the same as what existed on Mr. Capobianco's team.

104.    Without access to the main source of customer leads, Relator was barely able to earn 10 percent of what he had been earning prior to his complaint.  This was a direct result of Mr. Capobianco's retaliatory actions.

Complaint

105.    By September of 2021, Relator's situation at the Company was untenable. He could barely bring in a five-figure income, and he could not pay his rent.

106.    Relator was forced to resign and look for work elsewhere.

107.    However, the adverse employment actions taken by Cardinal against Relator left him deeply traumatized.

108.    His depression and anxiety became unmanageable and prevented him from being able to move forward with new opportunities in the lending field.

109.    Instead, Relator required intensive mental health treatment. He enrolled in a residential treatment program and continues to address the emotional and financial fallout from his decision to complain about unlawful discriminatory and fraudulent behavior at Cardinal.

## CAUSES OF ACTION

### Count I
### 31 U.S.C. § 3729(a)(1)(A)
### (As to All Defendants)

110.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

111.    This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

112.    Defendants have violated the FCA, 31 U.S.C. § 3729(a)(1)(A), by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval.

113.    The Government, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

114.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial

115.    Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Count II**
**31 U.S.C. § 3729(a)(1)(B)**
**(As to All Defendants)**

116.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

117.     This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

118.     Defendants have violated the FCA, 31 U.S.C. § 3729(a)(1)(B), by knowingly making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

119.     The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

120.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

121.     Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count III**
**31 U.S.C. § 3729(a)(1)(G)**
**(As to All Defendants)**

122.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

123.     This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.,* as amended.

124.     By and through the acts described above, Defendants have knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay money to the Government and they have concealed and improperly avoided an obligation to pay money to the Government.

125.     The Government, unaware of the concealment by the Defendants, has not made

28

Complaint

demand for or collected the overpayments due from the Defendants.

126.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

127.    Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**Count IV**
**31 U.S.C. § 3729(a)(1)(C)**
**(As to All Defendants)**

128.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

129.    This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, et seq., as amended.

130.    Defendants, as co-conspirators, entered into one or more conspiracies to knowingly present or cause to be presented false or fraudulent claims for payment or approval to the Government, to knowingly make, use, or cause to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government, and to knowingly make, use, or caused to be made or used a false record or statement material to an obligation to pay money to the Government and to conceal and improperly avoid an obligation to pay money to the Government.

131.    The Government, unaware of the fraudulent conduct described herein, and unaware of Defendants' conspiracy to violate the FCA, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

132.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

133.    Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable inflation laws, for each and every violation alleged herein.

**COUNT V**
**Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h)**
**(As to Defendant Cardinal)**

134.    Relator realleges and incorporates by reference all preceding paragraphs as if they

Complaint

1  were set forth again herein.

2  135.    The False Claims Act ("FCA") imposes liability on any person who: (1) knowingly

3  presents or causes to be presented a "false or fraudulent claim for payment or approval" by the

4  federal government; (2) knowingly "makes, uses, or causes to be made or used, a false record or

5  statement material to a false or fraudulent claim"; (3) knowingly "makes, uses, or causes to be

6  used, a false record or statement material to an obligation to pay or transmit money or property to

7  the Government"; (4) knowingly "conceals or… improperly avoids or decreases an obligation to

8  pay or transmit money or property to the Government"; or (e) "conspires" to commit any of the

9  above acts. 31 U.S.C. § 3729(a)(1).

10  136.    The FCA anti-retaliation provision prohibits an employer from discriminating in

11  any manner against an employee because of his "efforts to stop 1 or more violations of" the FCA.

12  31 U.S.C. §3730(h).

13  137.    Cardinal's annual FHA certification statements submitted with its FHA lender

14  application constitute "claims for approval" within the meaning of the False Claims Act.

15  138.    Here, Relator reasonably and in good faith believed that the lending practices he

16  observed violated Cardinal's assurances made in connection with its applications to be an approved

17  FHA lender, thus constituting violations of the FCA, 31 U.S.C. §3729(a)(1).

18  139.    Relator engaged in protected activity under the FCA when he complained to Mr.

19  Capobianco about these illegal practices.

20  140.    Cardinal's reprisal against Relator by cutting him off from all Company-generated

21  business leads and at least 80 percent of his business, constitutes illegal retaliation for Relator's

22  protected activity under the FCA.

23  141.    Cardinal's conduct was intentional, deliberate, willful and conducted with callous

24  disregard for Cardinal's protected activity under the FCA.

25  142.    As a direct and proximate result of Cardinal's illegal conduct, Relator has suffered

26  and will continue to suffer harm, and is entitled to all equitable and legal remedies available under

27  the FCA, law including, but not limited to, reinstatement, restoration of benefits, an award of two

28  times the amount of back pay, front pay, compensatory damages for emotional distress, punitive

30

Complaint

1    damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems

2    just and proper.

**Count VI**
**42 U.S.C. §1981 ("Section 1981") - Retaliation**
**(As to Defendant Cardinal)**

143.    Relator realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

144.    In violation of Section 1981, Cardinal retaliated against Relator for complaining about racial discrimination.

145.    As a direct and proximate consequence of Cardinal's retaliation against Relator, Relator suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income and employment benefits.

146.    As a direct and proximate consequence of Cardinal's retaliation against Relator, Relator suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Relator's good name and reputations, lasting embarrassment, humiliation, and anguish.

147.    As a result of Cardinal's unlawful conduct, Relator is entitled to compensatory damages, including but not limited to backpay, lost employment benefits, and damages for emotional distress, as well as front pay, punitive damages, post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

**COUNT VII**
**New York State Human Rights Law, NY Exec. Law §296 ("NYSHRL") – Retaliation**
**(As to Defendant Cardinal)**

148.    Relator realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

149.    In violation of the NYSHRL, Cardinal retaliated against Relator for complaining about racial discrimination.

150.    Cardinal's retaliation was sufficiently severe so as to affect the terms of Relator's employment.

151.    Cardinal's conduct was outrageous and malicious, was intended to injure, and was

31

Complaint

1    done with reckless indifference to Relator's statutorily-protected civil rights.

2        152.    As a direct and proximate consequence of Cardinal's retaliation against Relator, he

3    has suffered, and continues to suffer, substantial monetary and non-monetary damages, including,

4    but not limited to, emotional distress, physical pain and suffering, damage to Relator's good name

5    and reputation, lasting embarrassment, humiliation, and anguish.

6        153.    As a result of Cardinal's unlawful conduct, Relator is entitled to compensatory

7    damages, including but not limited to: damages for lost wages, emotional distress, punitive

8    damages, post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief

9    as the Court deems just and proper.

**COUNT VIII**
**New York City Human Rights Law, Admin. Code §§8-101 et seq. ("NYCHRL") –**
**Retaliation**
**(As to Defendant Cardinal)**

12        154.    Relator realleges and incorporates by reference all preceding paragraphs as if they

13    were set forth again herein.

14        155.    In violation of the NYCHRL, Cardinal retaliated against Relator for complaining

15    about racial discrimination.

16        156.    As a direct and proximate consequence of Cardinal's retaliation against Relator,

17    Relator suffered, and continues to suffer, substantial monetary damages, including, but not limited

18    to, a loss of income and employment benefits.

19        157.    As a direct and proximate consequence of Cardinal's retaliation against Relator,

20    Relator suffered, and continues to suffer, substantial non-monetary damages, including, but not

21    limited to, emotional distress, physical pain and suffering, damage to Relator's good name and

22    reputations, lasting embarrassment, humiliation, and anguish.

23        158.    As a result of Cardinal's unlawful conduct, Relator is entitled to compensatory

24    damages, including but not limited to backpay, lost employment benefits, and damages for

25    emotional distress, as well as front pay, punitive damages, post-judgment interest, attorneys' fees

26    and costs, and such other legal and equitable relief as this Court deems just and proper.

Complaint

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator prays for judgment against Defendants as follows:

159.    That Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*;

160.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus the maximum applicable civil penalty for each violation of 31 U.S.C. § 3729;

161.    That Plaintiff-Relator be awarded the maximum amount allowed pursuant to the False Claims Act, 31 U.S.C. § 3730(d);

162.    That Plaintiff-Relator be awarded compensatory, liquidated and punitive damages in an amount to be determined by the trier of fact;

163.    That Plaintiff-Relator be awarded all of his attorneys' fees, costs, and expenses; and

164.    That Plaintiffs United States and Plaintiff-Relator recover such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

165.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.


Dated: December 13, 2022                    /s/Michael A. Hirst
                                            Michael A. Hirst
                                            Marisela Bernal
                                            Hirst Law Group, P.C.
                                            200 B Street, Suite A
                                            Davis, California 95616
                                            michael.hirst@hirstlawgroup.com
                                            P: (530) 756-7700
                                            F: (530) 756-7707

Complaint

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/ D. Maimon Kirschenbaum
D. Maimon Kirschenbaum
Leah M. Seliger
Joseph & Korschenbaum LLP
32 Broadway Suite 601
New York, NY 10004
maimon@jk-llp.com
Phone: (212) 688-5640
Fax:    (212) 688-2548

Complaint

# Exhibit A

12:10

374

SR

Sal ›

can have the file😂. I don't think it's going to make much anyways.

Fri, Oct 29, 11:07 AM

Yo what did you pay me on the dolce file?

I only got like $1,300

Not dolce

Piedrahita*

Bro, Piedrahita made 5000 total to the branch, 800 dollar tolerance cure and it was in at real-time. I think You got 1750, maybe 1000-1500 less than you should've

but sarker I paid you 9000 dollars because I aged it before I left, but it was a was a real-time deal with a 15,000 dollar credit, so that deal made 7,200 total. You got paid about 4-5000 more on this one lol.

iMessage



# Exhibit B

Sal ›

Lmao!!!!!

"Yeah Frank said no".

Those exact words too

Starts it off with "yeah"

Hahaha

Got another purchase

Aged is still 175bps?

Is it conventional or fha

Conventional is 475

Conv

So split is 237.5

So that's ok we can do 175 if you hit Aged full boat.

If you have to concess we'll just rework it.



# Exhibit C



May 14, 2020

William Schaffer
1154 Spectrum
Irvine, CA 92618

Re: Offer of Employment with Cardinal Financial.

Dear William:

Cardinal Financial, a limited partnership (the "Company"), is pleased to offer you a position as Loan Originator Outside Sales on the terms set forth in this letter agreement, upon your acceptance by execution of a counterpart copy of this letter where indicated below. This offer will remain open until 5/29/20. Your tentative start date is 6/8/20. This date is subject to change based on results of your background check as referenced in paragraph 7 of this Offer Letter. Please be sure to sign the attached Background Check Authorization Form and complete your background check as soon as possible.

1.   Reporting; Duties and Responsibilities. In this position, you will report directly to the VP, Retail Market Leader, Frank Capobianco. Your specific duties and responsibilities will be determined by your supervisor. The Company may change your position, duties and responsibilities from time to time as it deems necessary.

2.   Compensation. Compensation is set forth and set out in specific detail in the **Employee Compensation Addendum** which is attached hereto and incorporated herein as **EXHIBIT A**.

3.   Benefits. Pursuant to the terms, conditions and limitations of the benefit plan documents, you will be eligible for the following standard Company benefits: health, dental and vision care insurance. Details about these benefit plans will be provided after you commence employment. The Company may modify your employee benefits as it deems necessary upon notice to you.

4.   Confidential Information; Employee Invention Assignment and Confidentiality Agreement.   As an employee of the Company, you will have access to certain Company confidential information and you may, during the course of your employment, develop certain information or inventions, which will be the property of the Company. To protect the interests of the Company, you will need to sign the Company's standard "Employee Confidentiality and Assignment of Inventions Agreement" as a condition of your employment. We wish to impress upon you that we do not wish you to bring with you any confidential or proprietary material of any former employer or other third parties, or to violate any other obligations to your former employers or other third parties.

5.   At-Will Employment. Both during the introductory period and thereafter, your employment with the Company is considered to be "at will". This means that you are free to resign at any time and for any reason, and the Company is free to terminate your employment at



any time, with or without cause or advance notice. Any statements or representations to the contrary (and, indeed, any statements contradicting any provision in this letter) is ineffective. Further, your participation in any stock option or benefit program is not to be regarded as assuring you of continuing employment for any particular period of time.

6. Authorization to Work. Because of Federal legal requirements, this offer of employment is subject to satisfactory proof of your right to work in the United States. If you have any questions about this requirement, which applies to U.S. citizens and non-U.S. citizens alike, please let me know.

7. Background Check.  This offer is contingent upon successful completion of a thorough background investigation to include a review of your credit, criminal history, and professional references at time of offer and throughout employment (if applicable). Additionally, this offer is contingent upon passing the Uniform State Test, or "UST" (if applicable). Your target start date may need to be adjusted in accordance with any delays the Company may encounter in conducting this investigation. The Company may rescind this offer in response to any negative results in compliance with Local, State, and Federal laws.  Negative results might include, without limitation, the discovery of any plea to a felony charge, misdemeanor convictions involving fraud or dishonesty, and any other information that may reflect poorly on your character and fitness to work in the financial industry.


We look forward to working with you.

Sincerely,

Cardinal Financial
Human Resources Team

Acknowledged, Accepted and Agreed

Signed:        _____
Print Name: William Schaffer
Date:

Accepted offer | William Schaffer II | Esign ID: 2EV912IJCLI-TO41U19PL | Esigned Date: 5/15/20 | Page: 3 of 26



## EXHIBIT A - COMPENSATION ADDENDUM
## LOAN ORIGINATOR OUTSIDE SALES – RETAIL LENDING

This Exhibit A, Compensation Addendum is an exhibit to and is hereby incorporated into the Employment Agreement ("Agreement") between William Schaffer (Employee") and Cardinal Financial Company, Limited Partnership ("Cardinal") effective June 8th, 2020. All defined terms not otherwise set forth in this Exhibit are set forth in the Agreement.

Compensation. Employee shall be paid on a commission only basis, as set forth below. As an outside salesperson, Employee shall be an exempt employee under the Fair Labor Standards Act, 29 U.S.C. 201 et seq. who is exempt from the requirement to be paid an overtime premium on the Employee Funding Incentive Commission Bonus or any other form of compensation. Employee must diligently maintain accurate and truthful records of hours worked each day and each workweek, including hours worked at Cardinal's place of business and hours worked outside of Cardinal's place of business. For additional information on what qualifies as Cardinal's place of business, Employee may consult Cardinal's human resource department.

Cardinal makes applicable commission payments semi-monthly, subject to standard payroll deductions and withholdings. The first semi-monthly payment shall be paid to Employee on the 15th day of each calendar month, ("First Pay Day") and the second semi-monthly payment shall be on the last day of each calendar month ("Second Pay Day") (each, a "Pay Day") throughout the term of this Agreement. If a Pay Day falls on a weekend day or a holiday, the Pay Day shall be the business day immediately preceding such weekend day or holiday. Cardinal shall have the right to adjust each Pay Day to a bi-weekly rather than a semi-monthly basis, upon advance notice to Employee. Cardinal makes applicable override payments on the First Pay Day in the month following the date the applicable originated loan was closed and funded, subject to standard payroll deductions and withholdings.

a) **Employee Funding Incentive Commission Bonus**. Cardinal shall pay Employee a commission bonus (the "Employee Funding Incentive Commission Bonus") on each loan for which Employee is listed as the loan originator at time of disbursement of funds to the borrower ("Funded Loan"), except as limited following Employee's termination. Subject to the Employee Funding Incentive Commission Bonus computation as described below, the Employee Funding Incentive Commission Bonus is payable to Employee on all loans regardless of who referred the applicant to Cardinal or Employee.

The Employee Funding Incentive Commission Bonus shall be calculated by determining the aggregate of all fixed incentive percentages on each Funded Loan (the "Fixed Incentive Percentage") for each pay cycle. The Fixed Incentive Percentage shall be calculated by multiplying the amount of the Funded Loan by the basis points ("bps") (where one bps equals 1/100th of one percent) of the applicable lead source in the table below.

| Lead/Loan | Bps | Maximum Commission |
|---|---|---|
| Self-Gen* | 75 | $7,500.00 |
| Real Time | 125 | $7,500.00 |



| Media | 150 | $7,500.00 |
|---|---|---|
| Aged | 175 | $7,500.00 |
| Brokered Loan**, irrespective of lead source | 50 | $7,500.00 |
| Recapture***, irrespective of lead source | N/A | N/A |

*A "Self-Generated Loan" means a loan which is (a) identified by Cardinal as sourced through a self-generated campaign source; (b) is either (i) not contained in Cardinal's marketing database; or (ii) is contained in Cardinal's marketing database as a lead for a period of 120 days or more prior to the rate lock of such loan, including but not limited to customers whose names were associated with existing consumer pre-screened trigger leads as defined in the federal Fair Credit Reporting Act, payoff requests or customer inquiries regarding a loan or application for a loan; and (c) if a refinance loan application from a loan in which Cardinal originated, one in which the borrower has made four (4) consecutive payments on the subject loan prior to acceptance of the application for the refinanced loan.

**Brokered, - A loan that is brokered by Employee on behalf of Cardinal for another lender

***Recapture -A loan in which the borrower of the Funded Loan (i) is a borrower on another loan currently owned or serviced by Cardinal at the time of the New Loan; and (ii) the Funded Loan is a re-financed loan used to pay off a loan currently owned or serviced by Cardinal at the time of the New Loan.

If Cardinal offers the same loan product as a Brokered Loan brokered by Employee, such Brokered Loan shall be multiplied by the same amount as the Cardinal Supplied Lead.

b) **Compensation Upon Termination**.   As may be more particularly described in Cardinal's Policies and Procedures, including but not limited to Cardinal's Employee Handbook, upon the termination of Employee's employment, Employee shall be eligible to receive an Employee Incentive Commission Bonus on applicable loans that Employee has originated and that fund within thirty (30) calendar days of Employee's last day of employment with Cardinal ("Termination Date"). Employee shall not be paid an Employee Funding Incentive Commission Bonus for loans that are funded more than thirty (30) calendar days after Employee's Termination Date. All other overrides, commissions and bonuses shall be earned at the time of the Pay Day for such applicable compensation. Other than the Employee Incentive Commission Bonus as described above, no other commission, override or bonus shall be paid in the event that Employee is not employed by Cardinal at the time of applicable Pay Day for such compensation.



Employee warrants and represents that Employee understands the terms, requirements, payments and calculations relating to the Employee Funding Incentive Commission Bonus as described under this Addendum.  By executing this Addendum, Employee acknowledges that Cardinal has provided Employee with satisfactory information regarding the terms, eligibility, requirements of this section, and that Employee understands the manner in which the Employee Funding Incentive Commission Bonus will be calculated and paid.


*[The remainder of this page intentionally left blank.  Signature page to follow.]*



**THIS EXHIBIT "A" IS HEREBY AGREED AND ACCEPTED TO:**

EMPLOYEE:                                    EMPLOYER:


_____            _____

 Signature                                   Signature


_____            _____

Printed Name                                 Printed Name


Date: _____                Date: _____



# CARDINAL FINANCIAL COMPANY, LIMITED PARTNERSHIP
# LOAN ORIGINATOR OUTSIDE SALES EMPLOYMENT AGREEMENT

THIS CARDINAL FINANCIAL COMPANY, LIMITED PARTNERSHIP LOAN ORIGINATOR OUTSIDE SALES EMPLOYMENT AGREEMENT (the "Agreement") is made and entered into on June 8th, 2020 (the "Execution Date") by and between William Schaffer ("Employee") and Cardinal Financial Company, Limited Partnership ("Cardinal"). Unless otherwise provided in a separate writing executed by both Employee and Cardinal, the execution date of this Agreement shall be the first day on which Employee begins to provide the services described in this Agreement to Cardinal (the "Start Date"). This Agreement is intended to protect important interests of Cardinal.

In consideration of the benefits of new or continued employment by Cardinal, including but not limited to salary, wages or other benefits, and in consideration of services provided or to be provided by Employee to Cardinal, Employee hereby covenants, acknowledges and agrees as follows, and Cardinal hereby accepts such covenants, acknowledgments and agreements.

## SECTION I: TERMS OF EMPLOYMENT

1.1 Scope of Duties. Employee's shall be employed with Cardinal in the position of Mortgage Loan Originator Outside Sales. Employee's specific duties and responsibilities will be determined by Employee's supervisor, although Cardinal may change Employee's position, duties and responsibilities from time to time at its sole discretion or as provided in Cardinal's Policies. While employed by Cardinal, Employee shall devote his or her full business time, attention, skill and effort to the performance of the duties that Cardinal may assign to Employee. Unless otherwise permitted by sole and absolute consent of Cardinal, Employee will be employed exclusively by Cardinal at all times and Employee will conduct only the business affairs of Cardinal during normal business hours. Employee will submit to, and participate in, regular and ongoing reviews of Employee's performance and work performed.

1.2 Employee Covenants. Employee covenants to Cardinal that during the tenure of Employee's employment with Cardinal, Employee shall: (i) be free to enter into employment with Cardinal and not subject to any restrictive covenants, including but not limited to a covenant against competition or solicitation or other similar agreement, other than those imposed by Employee's agreements with Cardinal; (ii) perform all of Employee's duties in good faith and consistent with Employee's ability, experience, and talent; (iii) devote all of Employee's business time and efforts to the performance of such duties; (iv) serve Cardinal with undivided loyalty in the performance of Employee's employment obligations; (v) not engage in any activity which conflicts with any of Employee's duties pursuant to this Agreement, whether or not such activity is pursued for gain, profit or other pecuniary advantage, provided that Employee may devote time to personal and family investments and to charitable and civic causes, in each case to the extent that such activities do not conflict (as reasonably determined by Cardinal's executive management or its board) with the discharge of Employee's duties hereunder; (v) comply with



any and all U.S. federal as well as state and local right to work regulations and shall immediately cooperate and comply with any request by Cardinal, either prior to or following execution of this Agreement, to obtain satisfactory proof of such right to work compliance.

 Employee's employment is contingent upon the successful completion of a background and reference check of Employee by Cardinal, for which Employee shall provide Cardinal applicable authorization and permission forms.  Employee covenants that he/she shall not use or disclose proprietary or confidential information or trade secrets of any other former or current employer or other entity ("Other Employer") with which Employee have any agreement or duty of confidentiality.  Employee further covenants that Employee shall not bring onto the premises of Cardinal any document, sample, computer program or proprietary information of any Other Employer, person or entity that is not available to the public generally.

1.3 <u>Duty of Loyalty</u>. Employee acknowledges and recognizes: (i) that Cardinal is engaged in a continuously marketing valuable products and services; (ii) that Employee's employment by Cardinal will create a relationship of confidence and trust with Cardinal with respect to said business; (iii) that unauthorized use or disclosure of Proprietary Information (as defined in Section 3 below, Cardinal's Personnel Handbook, and Cardinal's policies) would injure Cardinal; and (iv) that the covenants and agreements contained in this Agreement are material to and a requirement of Employee's employment with Cardinal and Cardinal is reasonably relying upon Employee's representations herein.

1.4 <u>Compensation</u>. Employee's compensation is set out in specific detail in the **Employee Compensation Addendum** which is attached hereto and incorporated herein as **EXHIBIT A**.  To the extent that any term, provision, promise or condition of the Employee Compensation Addendum conflicts with this Agreement, this Agreement shall control.

1.5 <u>Benefits</u>. Pursuant to the terms, conditions and limitations of Cardinal's benefit plan documents, Employee will be eligible for the following standard Cardinal benefits:  health, dental and vision care insurance.  Details about these benefit plans will be provided to Employee after commencement of employment.  In its sole discretion and for any or no reason, Cardinal may modify or terminate Employee's employee benefits as it deems necessary upon notice to Employee.

## SECTION II: PROPRIETARY AND OTHER OBLIGATIONS.

2.1 <u>Nondisclosure</u>. At all times during Employee's employment with Cardinal and thereafter, Employee shall hold in strictest confidence and will not disclose, use, lecture upon or disseminate any of Cardinal's Proprietary Information (defined below), except as such disclosure, use or dissemination may be required in connection with Employee's work for Cardinal, or unless an officer or director of Cardinal expressly authorizes such in writing. Employee hereby assigns to Cardinal any rights Employee may have or acquire in such Proprietary Information and recognizes that all Proprietary Information is and shall continue to be the sole and exclusive property of Cardinal and its assigns.

Accepted offer | William Schaffer II | Esign ID: 2EV912IJCLI-TO41U19PL | Esigned Date: 5/15/20 | Page: 9 of 26



2.2 <u>Proprietary Information</u>. "Proprietary Information" shall mean any and all confidential and/or proprietary knowledge, data or information of Cardinal related to Cardinal's business. By way of illustration but not limitation, "Proprietary Information" includes: (a) trade secrets, inventions, ideas, processes, formulas, data, programs, other works of authorship, knowhow, improvements, discoveries, developments, designs and techniques (hereinafter collectively referred to as "Inventions"); and (b) products, customers, accounts, suppliers, distributors, marketing activities or plans, business plans, distribution, pricing, financial matters, financial statements, software, or any information revealed to Cardinal by third parties under any confidentiality agreement, understanding or duty; (c) information regarding plans for research, development, new products, marketing and selling, business plans, business opportunities, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers; (d) information regarding the skills and compensation of other employees of Cardinal; (e) any and all DBAs, trademarks, trade-names or other property of Cardinal which may be used by Cardinal, regardless of how derived or the reason for use; and (e) information generally regarded as confidential in the industry or business in which Cardinal is engaged, which are or shall be owned, developed, used by, related to or arise from Cardinal, its products, businesses, activities, investigations, work of its employees or agents, utilization of equipment, supplies, facilities or information, now or in the future; and as may be further defined in Cardinal's Personnel Handbook or policies.

Employee acknowledges, represents and agrees that this Agreement is intended to protect the proprietary rights of Cardinal in important ways, and prevent the threat of any misuse of the Proprietary Information of Cardinal, which would be extremely harmful because of the importance of that information. In light of these considerations, Employee agrees that any court of competent jurisdiction may, upon the request of Cardinal, immediately grant Cardinal preliminary and permanent injunctive relief or any other equitable remedy necessary to remedy any breach of Articles 3 and/or 4 of this Agreement, and Employee specifically releases Cardinal from the requirement of posting any bond in connection with temporary or interlocutory injunctive relief, to the extent permitted by law.

2.3 <u>Third Party Information</u>. Employee understands, in addition, that Cardinal has received and in the future will receive from third parties, including but not limited to borrowers' non-public personal information, customers' or vendors', confidential or proprietary information ( "Third Party Information") subject to a duty on Cardinal's and/or its employees' part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of Employee's employment and thereafter, Employee shall hold Third Party Information in the strictest confidence and will not disclose to anyone (other than Cardinal personnel who need to know such information in connection with their work for Cardinal) or use, except in connection with Employee's work for Cardinal, Third Party Information unless expressly authorized by an officer or director of Cardinal in writing.

2.4 <u>No Improper Use of Information of Prior Employers and Others</u>. Employee acknowledges that Employee's performance of all the terms of this Agreement will not breach any proprietary information, trade secret, or any similar agreement with any Other Employer or



other party. Employee represents that he or she will not bring to Cardinal, or use in the performance of Employee's duties for Cardinal, any documents, materials or other information (whether defined as proprietary information or not) of any Other Employer or any other person that are not generally available to the public.

2.5 <u>Assignment of Inventions</u>. For purposes of this Agreement, the term "Proprietary Rights" shall mean all trade secret, patent, copyright, mask work, Inventions and other intellectual property rights throughout the world. Employee hereby assigns and agrees to assign in the future (when any such Inventions or Proprietary Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to Cardinal all of Employee's right, title and interest in and to any and all Inventions and Proprietary Rights whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice or learned by Employee, either alone or jointly with others, during the period of Employee's employment with Cardinal. Employee acknowledges that all original works of authorship that are principally related to mortgage services, correspondent lending or loan securitization and those trade secrets, Inventions, ideas, processes, formulas, data, programs, other works of authorship, know-how, discoveries, developments, designs or techniques outside of mortgage services, correspondent lending or loan securitization, but created during Employee's work hours and/or using Cardinal's resources, which are made by Employee (solely or jointly with others) within the scope of Employee's employment and are the sole and exclusive property of Cardinal and its assigns. This Agreement does not require assignment of any invention that qualifies for protection under Section 2870 of the California Labor Code.

2.6 <u>Disclosure to Future Employers</u>. Employee hereby authorizes Cardinal to notify others, including but not limited to customers of Cardinal or Employee's future employers of the terms of this Agreement and Employee's responsibilities hereunder.

## SECTION III: AT-WILL EMPLOYMENT

3.1 At-Will Employment. EMPLOYEE ACKNOWLEDGES, REPRESENTS AND AGREES THAT EMPLOYEE'S EMPLOYMENT IS AT-WILL AND THAT EMPLOYEE HAS NOT BEEN HIRED FOR ANY SPECIFIC TERM. EMPLOYEE ACKNOWLEDGES AND AGREES THAT EITHER CARDINAL OR EMPLOYEE MAY TERMINATE EMPLOYMENT AT ANY TIME, FOR ANY REASON OR FOR NO REASON, WITH OR WITHOUT NOTICE AND WITHOUT ANY PROCEDURE OR FORMALITY. Employee further acknowledges, represents and agrees that nothing in this agreement, any addenda hereto, the Personnel Handbook, or any other agreement, document, correspondence or verbal communication between Employee and Cardinal alters Employee's at-will employment status. In addition, the rate of salary or other compensation do not mean that employee is guaranteed employment for any period of time.

Without limiting the foregoing, if Employee is a loan originator, Employee understands that Cardinal's decision to employ is predicated upon Employee's ability to legally originate loans and maintain a license which will allow Employee to legally originate. In the event that

Accepted offer | William Schaffer II | Esign ID: 2EV912IJCLI-TO41U19PL | Esigned Date: 5/15/20 | Page: 11 of 26



Employee fails to maintain such proper licensure, either through expiration of a temporary authority to operate or otherwise, Employee understands that Cardinal may immediately terminate Employee.

3.2 <u>Cardinal's Right to Modify Employment</u>. Employee acknowledges, represents and agrees that Cardinal retains the sole and exclusive right at any time, with or without cause and with or without advance notice, to change or eliminate all policies, practices and terms and conditions of Employee's employment including, without limitation, the right to transfer, discipline, demote, promote or reassign employee, to increase or decrease Employee's compensation, to change or eliminate any job, duty, responsibility, reporting relationship and all benefit plans and programs, whether related to this Agreement, any addenda hereto, the Personnel Handbook, or otherwise.

3.3.    <u>Entire Agreement</u>. This Agreement sets forth the entire agreement and understanding between Employee and Cardinal hereto with regard to the employment of the Employee by Cardinal and supersedes any and all prior agreements, arrangements and understandings, written or oral, pertaining to the subject matter hereof. No representation, promise or inducement relating to the subject matter hereof has been made to a party that is not embodied in this Agreement, and no party shall be bound by or liable for any alleged representation, promise or inducement not so set forth.

3.4.    <u>Agreement Modification</u>.  Other than with respect to the Compensation Addendum Employee acknowledges, represents and agrees that any modification of any term or condition of this Agreement ("Employment Agreement Modification"), must be in writing and signed by employee and Cardinal's Chief Executive Officer, its President, or its Director of Human Resources (collectively, Cardinal's "Authorized Employment Modification Signatories").

Employee acknowledges, represents and agrees that no employee, agent or representative of Cardinal, except Cardinal's Authorized Employment Modification Signatories have the authority to enter into any Employment Agreement Modification.

Employee acknowledges, represents and agrees that any modification of any term or condition of the Employee Compensation Addendum ("Compensation Modification") must be in writing and signed by employee and Cardinal's Executive Vice President of Production or its Director of Human Resources (collectively, Cardinal's "Authorized Compensation Modification Signatories").  Employee acknowledges, represents and agrees that no employee, agent or representative of Cardinal, except Cardinal's Authorized Compensation Modification Signatories have the authority to enter into any Compensation Modification.

3.5 <u>Policies and Procedures</u>. As a condition of eligibility for employment with Cardinal, Employee agrees to abide by, comply with and be subject to all of Cardinal's policies and procedures, including those provisions and covenants that are more specifically defined in Cardinal's Personnel Handbook (collectively, the "Policies and Procedures").  The "Personnel Handbook" is Cardinal's personnel handbook which describes policies and procedures regarding employment at Cardinal, and which Carinal may be update from time to time, with or



without notice. The Parties agree that Employee is subject to and shall comply with the Policies and Procedures of Cardinal and its affiliates. Policies and Procedures, whether contained in the

Personnel Handbook or not, may be modified, added to or eliminated from time to time at the sole and absolute discretion of Cardinal, and Employee shall be bound to comply with such Policies and Procedures.

# SECTION IV: REQUIREMENTS AND PROHIBITIONS UPON TERMINATION

4.1 <u>Return of Cardinal Property Upon Termination</u>. On or before the termination of Employee's employment with Cardinal or any of its affiliates ("Termination"), Employee will return to Cardinal all of Cardinal's property including, but not limited to equipment, documents, data, information and media, whether written, electronic or otherwise, pertaining to the past, present, future or anticipated business, trade or industry of Cardinal, Employee's specific duties for Cardinal or Proprietary Information or Inventions in any form (including, but not limited to, all copies of such materials in tangible, magnetic, digital or other form).

4.2 <u>Prohibited Use of Cardinal Proprietary Information and Inventions</u>. Upon Employee's Termination, Employee agrees that he or she will not take, retain, use, disclose or disseminate any originals, copies or reproduction of any documents, data or information, in any form whatsoever, pertaining to any Proprietary Information or Inventions, except as otherwise authorized in this Agreement.

4.3 <u>Termination Requirements of the Personnel Handbook</u>. Employee acknowledges, represents and agrees to all further applicable provisions and policies pertaining to termination of employment as provided more fully in the Personnel Handbook or any of Cardinal's other policies.

4.4 <u>References by Cardinal to Prospective Employers of Former Employees</u>. Employee acknowledges, represents and agrees that Cardinal's policy is that Cardinal will only inform prospective employers of former and/or terminated employees: (1) whether that employee worked for Cardinal; and (2) the dates of employment. However, Employee also acknowledges, represents and agrees that there may be some exceptions to that general rule and that, in some circumstances, additional information may be provided by Cardinal. In this regard, Employee hereby waives, releases, discharges, and holds harmless Cardinal, its agents, servants, employees, subsidiaries, successors, assigns and all other persons, firms, partnerships and corporations from any and all claims, demands, damages, actions, causes of action, or suits of whatever kind or nature, including, but not limited to, claims brought under Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination in Employment Act of 1967 (as amended), the Americans with Disabilities Act of 1990 (as amended), any state anti-discrimination act (as amended), or any other federal, state, or local law, because of, arising out of or related in any way to Cardinal providing information to any employer with which Employee



may seek employment in the event Employee's employment with Cardinal is terminated for any reason.


# SECTION V:  NON-SOLICITATION

5.1 <u>Non-Solicitation of Cardinal Employees.</u>  The information regarding employees of Cardinal is Proprietary Information, including without limitation, the names of Cardinal employees; information regarding the skills and knowledge of employees of Cardinal; information regarding any past, present, or intended compensation, benefits, policies and incentives for employees of Cardinal; and information regarding the management and reporting structure of Cardinal.  Employee acknowledges, represents and agrees that in consideration of Employee's employment with Cardinal and for other good and valuable consideration hereby received that for a period of one (1) year after the date upon which Employee's Termination occurred, Employee shall not, individually or with others, directly or indirectly or any third party (including without limitation, individually or through any business, venture, proprietorship, partnership, or corporation in which they control or own more than a five (5) percent interest, through any agents, contractors, or recruiters, or by their successors, employees, or assigns) without the prior written consent of Cardinal, recruit, offer employment, solicit, employ, engage as a consultant, lure or entice away from Cardinal or any of its subsidiaries or affiliates, or in any other manner persuade or attempt to persuade to leave the employ of Cardinal or any of its subsidiaries or affiliates, any person who is an employee of Cardinal or any of its subsidiaries or affiliates.

5.2 <u>Non-Solicitation of Third Parties.</u> The Parties further agree that on or after Employee's Termination Date, Employee will not, either directly or indirectly, solicit or attempt to solicit any customer or client; or to directly or indirectly induce, entice, or cause a supplier, investor, vendor, consultant or, independent contractor of Cardinal to terminate, reduce or negatively alter his, her or its relationship with Cardinal. Nothing in this section should be construed to narrow the obligations of Employee imposed by any other provision herein, any other agreement, law or other source.

5.3 <u>Reasonableness of Non-Solicitation.</u>  The time limitation and the geographic scope on the restrictions in this section are reasonable.  Employee also acknowledges and agrees that the limitation in this section is reasonably necessary for the protection of Cardinal, that through this Agreement he shall receive adequate consideration for any loss of opportunity associated with the provisions herein, and that these provisions provide a reasonable way of protecting Cardinal's business value which was imparted to him. In the event that any term, word, clause, phrase, provision or restriction of this Section 5 of this Agreement is more restrictive than permitted by the law of the jurisdiction in which Cardinal seeks enforcement thereof, the provisions of this Agreement shall be limited only to that extent that a judicial determination finds the same to be unreasonable or otherwise unenforceable in such jurisdiction.

Accepted offer | William Schaffer II | Esign ID: 2EV912IJCLI-TO41U19PL | Esigned Date: 5/15/20 | Page: 14 of 26



## SECTION VI:  MISCELLANEOUS

6.1 <u>Taxes</u>.  All payments to Employee hereunder shall be subject to such withholdings and other employee deductions as may be required by law. Employee agrees to be responsible for the payment of any taxes due on any and all compensation or benefit provided by the Company pursuant to this Agreement. . Any tax liability incurred by Employee under Section 409A of Title 26 of the United States Code, as amended in 1986, is solely the responsibility of Employee. Employee agrees to indemnify the Company and hold the Company harmless from any and all claims or penalties asserted against the Company for Employee's failure to pay taxes due on any compensation or benefit provided by the Company pursuant to this Agreement. Employee expressly acknowledges that the Company has not made, nor herein makes, any representation about the tax consequences of any consideration provided by the Company to Employee pursuant to this Agreement.

6.2 <u>Survival</u>.  Employee acknowledges, represents and agrees that the terms of this Agreement shall survive the termination of employment with Cardinal.

6.3 <u>Severability</u>. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

6.4    <u>Jury Waiver</u>.  **THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHT TO TRIAL BY JURY IN ANY ACTION CONCERNING THIS AGREEMENT OR ANY AND ALL MATTERS ARISING DIRECTLY OR INDIRECTLY HEREFROM AND REPRESENT THAT THEY HAVE CONSULTED WITH COUNSEL OF THEIR CHOICE OR HAVE CHOSEN VOLUNTARILY NOT TO DO SO SPECIFICALLY WITH RESPECT TO THIS WAIVER**.

6.5 <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of any successor or assignee of the business of Cardinal. This Agreement shall not be assignable by the Employee.

6.6 <u>Attorneys' Fees</u>. If either the Company or Employee shall obtain legal counsel or bring an action against the other to interpret or enforce this Agreement by reason of the breach of any covenant, warranty or condition hereof, or otherwise arising out of this Agreement the unsuccessful party shall pay to the prevailing party its reasonable attorneys' fees.

6.7 <u>No Waiver</u>.  Employee acknowledges, represents and agrees that the failure of Cardinal to take any action to enforce rights under this Agreement shall not affect Cardinal's rights to require performance hereunder or constitute a waiver of any subsequent breach.



6.8 <u>Construction and Counterparts</u>. This Agreement shall be deemed to have been drafted jointly by the Parties, and no ambiguity in the Agreement shall be construed against either Company or Employee. This Agreement may be executed in two counterparts, each of which need not contain signatures of more than one party, but both of which taken together will constitute one and the same Agreement. Facsimile signatures shall be deemed as effective as original signatures.

6.9 <u>Headings</u>. The headings of the sections hereof are inserted for convenience only and will not be deemed to constitute a part hereof nor to affect the meaning thereof.

# [Remainder of Page Intentionally Left Blank.  Signature Page to Follow on the Next Page]



By signing this Agreement Employee acknowledges that Employee has received, read and been informed of the meaning and intent of each referenced document, has been given an opportunity to discuss with personal legal counsel, and agree to be bound by each of these documents and agreements.

IN WITNESS WHEREOF, I HEREBY EXECUTE THIS AGREEMENT AS OF THE EXECUTION DATE SET FORTH ABOVE.

**EMPLOYEE:**

Accepted:

_____

Signature

_____

Printed Name

_____

Date

**CARDINAL:**

_____

Signature

_____

Printed Name and Title

_____

Date



**MUTUAL AGREEMENT TO ARBITRATE**

The Mutual Agreement to Arbitrate ("Agreement") is between Employee (referred to in this Agreement as "You," "I," "Your", or "Employee") and Cardinal Financial Company, LP, and its affiliates, subsidiaries, and dba's (hereafter the "Company"). The Federal Arbitration Act (9 U.S.C. § 1 et seq.) governs this Agreement, which evidences a transaction involving commerce. All disputes covered by this Agreement will be decided by a single arbitrator through final and binding arbitration and not by way of court or jury trial.

1)      CLAIMS COVERED: Except as it otherwise provides, this Agreement applies to any dispute, past, present, or future, that the Company may have against You or that You may have against the Company, and/or any of its/their:

•       officers, directors, members, partners, owners, shareholders, or employees;

•       benefit plans or the plans' sponsors, fiduciaries, administrators, affiliates or agents;

•       and predecessors, successors or assign

each and of all of whom/which may enforce this Agreement.

Except as it otherwise provides, this Agreement applies, without limitation, to claims based upon or related to discrimination, harassment, retaliation, defamation (including post-employment defamation or retaliation), breach of a contract or covenant, fraud, negligence, breach of fiduciary duty, trade secrets, unfair competition, wages, minimum wage and overtime or other compensation or any monies claimed to be owed, meal breaks and rest periods, termination, tort claims, common law claims, equitable claims, and claims arising under the Defend Trade Secrets Act, Fair Credit Reporting Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974), Affordable Care Act, Genetic Information Non-Discrimination Act, Uniformed Services Employment and Reemployment Rights Act, Worker Adjustment and Retraining Notification Act, Older Workers Benefits Protection Act of 1990, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, False Claims Act, state and local statutes or regulations addressing the same or similar subject matters, and all other federal, state, or local legal claims arising out of or relating to your application for employment, employment, or termination of employment.

The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the validity, applicability, enforceability, or waiver of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable.  But, as stated below,  the preceding sentence does not apply to the Class Action Waiver.

2)      CLAIMS NOT COVERED AND LIMITATIONS ON HOW THIS AGREEMENT APPLIES: These claims are not covered under the Agreement: (i) Workers' Compensation benefits, state disability insurance benefits or unemployment insurance benefits; however, it applies to



discrimination or retaliation claims based upon seeking such benefits claims; (ii) disputes that an applicable federal statute expressly states cannot be arbitrated or subject to a pre-dispute arbitration agreement; (iii) disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act; and (iv) representative actions for civil penalties filed under the California Private Attorney General Act ( "PAGA") (but  to the extent permitted by applicable law, any claim by You on Your own behalf under PAGA to recover Your unpaid wages must be arbitrated and is covered by this Agreement).

Further Exclusion. This Agreement also does not apply to any pending class or collective action lawsuit of which Employee is already a member or putative member ("Pending Claims Exclusion"); however, if Employee previously entered into an arbitration agreement with the Company that included a class and/or collective action waiver that covered such class or collective action, that class or collective action waiver will continue to apply and prevent You from being a party to or participating in any such class and/or collective action ("Pending Claims Exclusion Exception").


Nothing in this Agreement prevents You from making a report to or filing a claim or charge with a governmental agency, including without limitation, the Equal Employment Opportunity Commission, U.S. Department of Labor, Securities and Exchange Commission, National Labor Relations Board, Occupational Safety and Health Administration, Office of Federal Contract Compliance Programs, or law enforcement agencies, and nothing in this Agreement prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Agreement. This Agreement also does not prevent federal administrative agencies from adjudicating claims and awarding remedies, even if the claims would otherwise be covered by this Agreement.  Nothing in this Agreement prevents or excuses a party from exhausting administrative remedies by filing any charges or complaints required by any governmental agency before bringing a claim in arbitration.  This Agreement also does not prevent or prohibit You in anyway from reporting, communicating about, or disclosing claims for discrimination, retaliation, harassment, or sexual abuse.

A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, including without limitation any dispute arising out of or related to any "Employment Agreement" between Employee and the Company, in accordance with applicable law, and any such application shall not be deemed incompatible with or waiver of this agreement to arbitrate. The court to which the application is made is authorized to consider the merits of the arbitrable controversy to the extent it deems necessary in making its ruling, but only to the extent permitted by applicable law. All determinations of final relief, however, will be decided in arbitration.

3)     PROCEDURES:  The arbitration will be administered by the AAA, and except as provided in this Agreement, will be under the then current Employment Arbitration Rules of the AAA ("AAA Rules") (the AAA Rules are available via the internet at www.adr.org/employment or by using a service such as www.google.com to search for "AAA Employment Arbitration Rules".); provided however, if there is a conflict between the AAA Rules and this Agreement, this Agreement shall govern. Unless the parties jointly agree otherwise, the Arbitrator must be an attorney experienced in employment law and licensed to practice law in the state in which the



arbitration is convened, or a former judge from any jurisdiction. Unless the parties jointly agree otherwise, the arbitration will take place in or near the city and in the state where I am currently employed or was last employed by the Company.

The Arbitrator will be selected as follows: The AAA will give each party a list of nine (9) arbitrators (who are subject to the qualifications listed in the preceding paragraph) drawn from its panel of arbitrators. Each party will have seven (7) calendar days to strike all names on the list it deems unacceptable. If only one common name remains on the lists of all parties, that individual will be designated as the Arbitrator. If more than one common name remains on the lists of all parties, the parties will strike names alternately from the list of common names by telephone conference convened by AAA, with the party to strike first to be determined by a coin toss conducted by AAA, until only one remains. If no common name remains on the lists of all parties, the AAA will furnish an additional list of nine (9) arbitrators from which the parties will strike alternately by telephone conference convened by AAA, with the party to strike first to be determined by a coin toss conducted by AAA, until only one name remains. That person will be designated as the Arbitrator. If the individual selected cannot serve, AAA will issue another list of nine (9) arbitrators and repeat the alternate striking selection process.

The Arbitrator will apply the substantive federal, state, or local law applicable to the claim(s) asserted. Either party may file dispositive motions, including without limitation a motion to dismiss and/or a motion for summary judgment.

The Arbitrator will issue an award by written opinion, which  will include the factual and legal basis for the award, within thirty (30) days from the date the arbitration hearing concludes or the post hearing briefs (if requested) are received, whichever is later. The award issued by the Arbitrator may be entered in any court of competent jurisdiction.

4)      DISCOVERY AND SUBPOENAS:  Each party may take the deposition of two individual fact witnesses and any expert witness designated by another party. Each party also may propound requests for production of documents and five (5) interrogatory requests to the other party. And, each party may subpoena witnesses and documents for discovery or the arbitration hearing. The parties may mutually agree to additional discovery, and the Arbitrator will have exclusive authority to entertain requests for additional discovery, and to grant or deny such requests.

5)      CLASS ACTION WAIVER:   The Company and I agree to bring any claim on an individual basis. Accordingly,

THE COMPANY AND I WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A CLASS AND/OR COLLECTIVE ACTION AND THE ARBITRATOR WILL HAVE NO AUTHORITY TO HEAR OR PRESIDE OVER ANY SUCH CLAIM ("Class Action Waiver"). If a final judicial determination is made that the Class Action Waiver is unenforceable and that a class or collective action may proceed notwithstanding the existence of this Agreement, the Arbitrator is nevertheless without authority to preside over a



class or collective action and any class or collective action must be brought in a court of competent jurisdiction—not in arbitration.

Regardless of anything else in this Agreement and/or the AAA Rules or other applicable rules, or any amendments and/or modifications to those rules, any claim that all or part of the Class Action Waiver and/or Collective Action Waiver, including, but not limited to any claim that all or part of the Class Action Waiver and/or Collective Action Waiver is invalid, unenforceable, unconscionable, void or voidable, may be determined only by a court of competent jurisdiction and not by an arbitrator.

6)    TIME FOR INITIATING AND NOTICE OF ARBITRATION:  The party initiating the claim must make a written demand for arbitration of the claim to the other party by the expiration of the statute of limitations (deadline for filing) that the law prescribes for the claim.  Written demand for arbitration to the Company must be sent to: Cardinal Financial Company – Arbitration Intake, 3701 Arco Corporate Dr., Suite 200, Charlotte, NC 28273.  You will be given notice of any demand for arbitration by the Company at the last home address You provided to the Company. The Arbitrator will resolve all disputes regarding the timeliness or propriety of the demand for arbitration.

7)    FEES AND COSTS:  The Company will pay the Arbitrator's and arbitration fees and costs as required by the AAA Rules and applicable law, except for the filing fee as required by AAA. Each party will pay for its own costs and attorneys' fees, if any, but if any party prevails on a claim which affords the prevailing party attorneys' fees, the Arbitrator may award reasonable fees to the prevailing party as provided by law. The Arbitrator will resolve any disputes regarding costs/fees associated with arbitration.

8)    OFFER OF JUDGMENT:  A party may make an offer of judgment in a manner consistent with, and within the time limitations, consequences, and effects provided in Rule 68 of the Federal Rules of Civil Procedure.  The offer shall be served on the offeree in the same manner in which other papers are served in the arbitral proceeding.  The offer shall not be served on the Arbitrator, except that if the offer is accepted, either party may then file with the Arbitrator the offer and notice of acceptance together with proof of service thereof.  The Arbitrator shall then immediately render an award as provided by the offer, and the arbitration proceedings shall then be terminated.  If the offer is not accepted, the offer shall not be used as evidence in the arbitration proceedings and, following the issuance of the Arbitrator's award, the offeror may file a motion for costs with the Arbitrator, who shall retain jurisdiction to decide the motion and award costs to the offeror as warranted.

9)    ENTIRE AGREEMENT:  This is the complete agreement of the parties about arbitration of covered disputes. Any contractual disclaimers the Company has in any handbooks, other agreements, or policies do not apply to this Agreement. Unless this Agreement is deemed void, unenforceable or invalid in its entirety, and unless subject to the Pending Claims Exclusion Exception above, this Agreement supersedes any prior agreements to arbitrate, and constitutes an "Employment Agreement Modification" for purposes of modifying any inconsistent term or condition, if any, in any Employment Agreement between Employee and the Company. This Agreement also applies to any disputes arising out of or related to any Employment Agreement between Employee and the Company. This Agreement will survive the termination of Your employment and the expiration of any benefit, and it will apply upon re-employment by the



Company if Your employment is ended but later renewed. Notwithstanding any contrary language, if any, in any Employee Handbook and addendums or any other Employer policy or practice, this Agreement may not be modified or terminated absent a writing signed (electronically or otherwise) by both parties.

10) CONSTRUCTION: Subject to what is stated above regarding the Class Action Waiver, in the event any portion of this Agreement is deemed unenforceable, the unenforceable provision will be severed from the Agreement and the remainder of this Agreement will be enforceable. This Agreement does not alter the "at-will" status of Employee's employment.

**AGREED BY EMPLOYEE AND THE COMPANY**

I HAVE CAREFULLY READ AND UNDERSTAND THIS AGREEMENT AND AGREE TO ITS TERMS. BY SIGNING MY NAME BELOW AND/OR BY USING AN ELECTRONIC MEANS OF ACCEPTANCE, I AGREE THAT THE COMPANY AND I ARE AGREEING TO ARBITRATE DISPUTES COVERED BY THIS AGREEMENT. I ALSO AGREE THAT TO THE EXTENT I USE AN ELECTRONIC MEANS OF ACCEPTANCE ("ELECTRONIC SIGNATURE") AS MY ACCEPTANCE TO THIS AGREEMENT, I UNDERSTAND AND ACKNOWLEDGE THAT MY ELECTRONIC SIGNATURE IS INTENDED TO SHOW MY ACCEPTANCE AND IS AS VALID AND HAS THE SAME LEGAL EFFECT AS AN INK SIGNATURE.

_____    _____

EMPLOYEE SIGNATURE                              DATE


_____

EMPLOYEE NAME PRINTED

Karla Racer                          VP of Human Resources

_____    _____

SIGNATURE OF AUTHORIZED COMPANY REP.  TITLE OF REPRESENTATIVE



# Loan Originator Attestation

As a Loan Originator at Cardinal Financial Company, Limited Partnership ("Cardinal" or "Company"), I acknowledge that I have a fiduciary duty to Cardinal to ensure that I do not put the Company unnecessarily at risk.  Cardinal has made it very clear to me through my Employment Agreement, Acknowledgment of Prohibited Information, Cardinal's employee handbook and Company policy (collectively, the "Policy") that I will not transfer another business' information or work product to Cardinal.  Having this full understanding of the Policy, I hereby attest to the following:

1.  I have not received or obtained, downloaded, uploaded, brought, or in any other way transferred any other business' proprietary or confidential information to Cardinal or Cardinal's systems, including but not limited to any past employer's client list, loan file, application, work product, computer programs, trade secret, proprietary computations, material, document or sample.

2.  I have not received or obtained, downloaded uploaded, brought or any other way transferred any past customer information, tax information, applications, loan data or information, income, social security numbers, or any other personal identifying information that was first obtained at another business, including but not limited to, past employers.

3.  While I was an employee at another company, I have not transferred customer information or provided names of my prior employer's customers to a Cardinal employee.

4.  I recognize and acknowledge that I have read carefully the Employment Agreement, Acknowledgement of Prohibition Information and are fully aware of the Policy prohibiting what information is prohibited from being brought on Cardinal's property or systems.

5.  I have fully disclosed to Cardinal that I:
    a.  Am subject to a non-solicitation clause from a past employer and am limited in soliciting either customers or employees of my prior company.
    b.  Do not have an active non-solicitation clause from any past employee.

6.  I will not solicit employees from any past employer that violates any past employment agreement.

7.  For any customers of a prior employer who wish to follow me to Cardinal and have their loan originated at Cardinal rather than my past employer, I will make them aware of the following:
    a.  I am a Cardinal employee and no longer affiliated with my past employer;
    b.  The customer is free to choose to have their loan originated at Cardinal or any other lender;
    c.  New applications must be submitted and information must be re-submitted to Cardinal, rather than being transferred from another company;




8. I will make any and all employees under my direct or indirect supervision of the Policy aware of the prohibitions pertaining to customer and proprietary information, as well as the subject matter contained in this Attestation, will train Cardinal employees that I supervise of such subject matter, and will endeavor to eliminate any improper transfer or solicitation of customers or individuals from those under my direct or indirect supervision.

IN WITNESS WHEREOF, I HEREBY ACKNOWLEGE AND REPRESENT THAT THE FOREGOING STATEMENTS ARE CURRENTLY TRUE AND CORRECT AS OF THE DATE OF THIS ACKNOWLEDGMENT AND SHALL CONTINUE TO BE TRUE THROUGHOUT THE TERM OF MY EMPLOYMENT AT CARDINAL.

**EMPLOYEE:**

Acknowledged:

_____

Signature

_____

Printed Name

_____

Date

Accepted offer | William Schaffer II | Esign ID: 2EV912IJCLI-TO41U19PL | Esigned Date: 5/15/20 | Page: 24 of 26



# Background Check Authorization & Release

Cardinal Financial Company, Limited Partnership (the "Company") intends to obtain information about you from an investigative consumer reporting agency and/or a consumer credit reporting agency for employment purposes and throughout employment. Thus, you can expect to be the subject of "investigative consumer reports" and "consumer credit reports" obtained for employment purposes. Such reports may include information about your character, general reputation, personal characteristics and mode of living. With respect to any investigative consumer report from an investigative consumer reporting agency ("ICRA"), the Company may investigate the information contained in your employment application and other background information about you, including but not limited to obtaining a criminal record report, verifying references, work history, your social security number, your educational achievements, licensure, and certifications, your driving record, and other information about you, and interviewing people who are knowledgeable about you. The results of this report may be used as a factor in making employment decisions. The source of any investigative consumer report (as that term is defined under California law) or credit report will be:

> First Advantage
> P.O. Box 105292
> Atlanta, GA 30348
> Phone: 1-800-845-6004
> Privacy Policy : https://www.fadv.com/privacy-policy

The Company agrees to provide you with a copy of an investigative consumer report when required to do so. You are entitled to find out from an ICRA what is in the ICRA's file on you with proper identification, as follows:

You are entitled, upon presentation of proper identification, to find out from an investigative consumer reporting agency what is in your file, as follows:

> 1. In person, by visual inspection of your file during normal business hours and on reasonable notice;
> 2. By obtaining a summary of it via telephone call, if you have made a written request with proper identification, for telephone disclosure and the toll charge, if any, for the telephone call is prepaid by you or charged directly to you; or,
> 3. By requesting in writing, with proper identification, that a copy of it be sent to a specified addressee by certified mail.

Investigative consumer reporting agencies complying with requests for certified mailings shall not be liable for disclosures to third parties caused by mishandling of mail after such mailings leaves the investigative consumer reporting agency. The investigative consumer reporting agency may charge you a reasonable fee for making disclosures regarding your investigative consumer report. If you appear in person and furnish proper identification, the investigative consumer reporting agency may charge you a fee not to exceed the actual costs of duplication services provided in order to provide you with a copy of the file.



The investigative consumer reporting agency shall provide trained personnel to explain to you any information furnished and shall also provide a written explanation of any coded information contained in files maintained on you. This written explanation shall be distributed whenever a file is provided to you for visual inspection as required under Section 1786.22 of the California Civil Code. You may be accompanied by one other person of your choosing, who must furnish reasonable identification. An investigative consumer reporting agency may require you to furnish a written statement granting permission to the investigative consumer reporting agency to discuss your file in such person's presence.

The term "**proper identification**" as used above means that information generally deemed sufficient to identify a person. Such information includes documents such as a valid driver's license, social security account number, military identification card, and credit cards. Only if you are unable to reasonably identify yourself with the information described herein, may an investigative consumer reporting agency require additional information concerning your employment and personal or family history in order to verify your identity

Acknowledged, Agreed, and Accepted,

_____
Employee Name (Print)

_____     _____
Employee Signature                          Date

Case 2:22-cv-02209-DC-AC     Document 1     Filed 12/14/22     Page 65 of 80

Filling in the following information will constitute your eSignature and will have the same legal impact as signing a printed version of this document.



Password Verified 

Name: *William Schaffer II*
Date: 5/15/20 (m/d/yy)
Signature ID: 2EV912IJCLI-TO41U19PL

Powered by 

# Exhibit D

11:44 AM



**Frank Capobianco**

So property value up 50-200% people at 50/55 dti. what happens when everyone taxes reassed 2022 on new values and real estate taxes go up by 30/50% next year ? 🙄

**Mike Braunstein**



They don't check DTI's once you foreclose

 1     

**Frank Capobianco**

# Exhibit E

CARDINAL FINANCIAL COMPANY, LIMITED - 71587
Lender Branch Originations in the United States
Delinquent Choice - Seriously Delinquent
Loan Portfolio - 2 Year FHA
Performance Period - 06/30/2022
Active Terminated Merged Originating Branches
Data shown includes all insured single family loans with beginning amortization date between July 1, 2020 and June 30, 2022

| Branch | Branch Status | Total Compare Ratio% | Total Orig | Total Seriously Delinquent | Total Claims | Total Seriously Delinquent and Claims | % Seriously Delinquent and Claims | United States Total Orig | United States Total Seriously Delinquent | United States Total Claims | United States Total Seriously Delinquent and Claims | United States % Seriously Delinquent and Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7158703725 | T | 1297 | 3 | 1 | 0 | 1 | 33.33 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158704057 | T | 778 | 5 | 1 | 0 | 1 | 20 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703929 | A | 502 | 31 | 4 | 0 | 4 | 12.9 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158705119 | A | 486 | 8 | 1 | 0 | 1 | 12.5 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703363 | T | 486 | 24 | 3 | 0 | 3 | 12.5 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703371 | T | 432 | 9 | 1 | 0 | 1 | 11.11 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703290 | T | 432 | 9 | 1 | 0 | 1 | 11.11 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703203 | T | 429 | 127 | 14 | 0 | 14 | 11.02 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703862 | T | 389 | 10 | 1 | 0 | 1 | 10 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703600 | A | 370 | 63 | 6 | 0 | 6 | 9.52 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703970 | T | 354 | 22 | 2 | 0 | 2 | 9.09 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703509 | T | 354 | 11 | 1 | 0 | 1 | 9.09 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702499 | T | 354 | 22 | 2 | 0 | 2 | 9.09 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702418 | A | 354 | 33 | 3 | 0 | 3 | 9.09 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701198 | T | 335 | 58 | 5 | 0 | 5 | 8.62 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703016 | T | 324 | 12 | 1 | 0 | 1 | 8.33 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701799 | A | 324 | 24 | 2 | 0 | 2 | 8.33 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703130 | T | 299 | 13 | 1 | 0 | 1 | 7.69 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701747 | T | 295 | 79 | 6 | 0 | 6 | 7.59 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158704352 | T | 278 | 28 | 2 | 0 | 2 | 7.14 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703652 | T | 278 | 14 | 1 | 0 | 1 | 7.14 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702969 | A | 268 | 29 | 2 | 0 | 2 | 6.9 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701327 | A | 268 | 58 | 4 | 0 | 4 | 6.9 | 1965351 | 50543 | 42 | 50585 | 2.57 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7158702771 A | 263 | 222 | 15 | 0 | 15 | 6.76 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701963 A | 261 | 224 | 15 | 0 | 15 | 6.7 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700061 A | 260 | 45 | 3 | 0 | 3 | 6.67 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701701 A | 251 | 31 | 2 | 0 | 2 | 6.45 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702322 A | 243 | 176 | 11 | 0 | 11 | 6.25 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158704918 A | 236 | 33 | 2 | 0 | 2 | 6.06 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703719 A | 236 | 33 | 2 | 0 | 2 | 6.06 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158704171 A | 229 | 34 | 2 | 0 | 2 | 5.88 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701391 T | 229 | 17 | 1 | 0 | 1 | 5.88 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700889 A | 226 | 172 | 10 | 0 | 10 | 5.81 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702257 A | 225 | 121 | 7 | 0 | 7 | 5.79 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703632 T | 222 | 35 | 2 | 0 | 2 | 5.71 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702923 A | 222 | 35 | 2 | 0 | 2 | 5.71 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702981 T | 216 | 18 | 1 | 0 | 1 | 5.56 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703567 T | 212 | 330 | 18 | 0 | 18 | 5.45 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703118 A | 211 | 37 | 2 | 0 | 2 | 5.41 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158704527 A | 205 | 19 | 1 | 0 | 1 | 5.26 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701146 T | 205 | 19 | 1 | 0 | 1 | 5.26 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158704398 T | 195 | 20 | 1 | 0 | 1 | 5 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703623 A | 195 | 20 | 1 | 0 | 1 | 5 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701928 A | 190 | 82 | 4 | 0 | 4 | 4.88 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701595 T | 189 | 185 | 9 | 0 | 9 | 4.86 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701782 A | 185 | 21 | 1 | 0 | 1 | 4.76 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158704766 A | 177 | 22 | 4 | 0 | 4 | 4.55 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703935 A | 177 | 88 | 4 | 0 | 4 | 4.55 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703906 A | 177 | 22 | 1 | 0 | 1 | 4.55 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703124 A | 173 | 338 | 15 | 0 | 15 | 4.44 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703891 T | 169 | 23 | 1 | 0 | 1 | 4.35 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702736 T | 169 | 46 | 2 | 0 | 2 | 4.35 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700446 A | 168 | 139 | 6 | 0 | 6 | 4.32 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700895 A | 165 | 165 | 7 | 0 | 7 | 4.24 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703856 A | 165 | 213 | 9 | 0 | 9 | 4.23 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703328 A | 156 | 25 | 1 | 0 | 1 | 4 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702952 A | 156 | 75 | 3 | 0 | 3 | 4 | 1965351 | 50543 | 42 | 50585 | 2.57 |

| 2.57 | 50585 | 42 | 50543 | 3.97 | 1965351 | 6 | 0 | 6 | 151 | 154 | 7158702430 A |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2.57 | 50585 | 42 | 50543 | 3.95 | 1965351 | 3 | 0 | 3 | 76 | 154 | 7158704635 A |
| 2.57 | 50585 | 42 | 50543 | 3.85 | 1965351 | 2 | 0 | 2 | 52 | 150 | 7158701021 A |
| 2.57 | 50585 | 42 | 50543 | 3.7 | 1965351 | 1 | 0 | 1 | 27 | 144 | 7158701832 A |
| 2.57 | 50585 | 42 | 50543 | 3.64 | 1965351 | 2 | 0 | 2 | 55 | 142 | 7158701202 T |
| 2.57 | 50585 | 42 | 50543 | 3.62 | 1965351 | 11 | 0 | 11 | 304 | 141 | 7158702447 A |
| 2.57 | 50585 | 42 | 50543 | 3.57 | 1965351 | 1 | 0 | 1 | 28 | 139 | 7158702561 A |
| 2.57 | 50585 | 42 | 50543 | 3.5 | 1965351 | 5 | 0 | 5 | 143 | 136 | 7158702482 A |
| 2.57 | 50585 | 42 | 50543 | 3.49 | 1965351 | 12 | 0 | 12 | 344 | 136 | 7158701406 A |
| 2.57 | 50585 | 42 | 50543 | 3.45 | 1965351 | 2 | 0 | 2 | 58 | 134 | 7158702518 A |
| 2.57 | 50585 | 42 | 50543 | 3.42 | 1965351 | 9 | 0 | 9 | 263 | 133 | 7158700951 A |
| 2.57 | 50585 | 42 | 50543 | 3.35 | 1965351 | 7 | 0 | 7 | 209 | 130 | 7158701878 A |
| 2.57 | 50585 | 42 | 50543 | 3.28 | 1965351 | 2 | 0 | 2 | 61 | 128 | 7158700387 A |
| 2.57 | 50585 | 42 | 50543 | 3.23 | 1965351 | 1 | 0 | 1 | 31 | 126 | 7158703754 T |
| 2.57 | 50585 | 42 | 50543 | 3.19 | 1965351 | 3 | 0 | 3 | 94 | 124 | 7158702634 A |
| 2.57 | 50585 | 42 | 50543 | 3.15 | 1965351 | 4 | 0 | 4 | 127 | 123 | 7158701304 A |
| 2.57 | 50585 | 42 | 50543 | 3.03 | 1965351 | 1 | 0 | 1 | 33 | 118 | 7158704282 T |
| 2.57 | 50585 | 42 | 50543 | 3.03 | 1965351 | 1 | 0 | 1 | 33 | 118 | 7158702503 A |
| 2.57 | 50585 | 42 | 50543 | 2.94 | 1965351 | 2 | 0 | 2 | 68 | 114 | 7158700321 T |
| 2.57 | 50585 | 42 | 50543 | 2.92 | 1965351 | 33 | 0 | 33 | 1131 | 114 | 7158700373 A |
| 2.57 | 50585 | 42 | 50543 | 2.86 | 1965351 | 1 | 0 | 1 | 35 | 111 | 7158703494 A |
| 2.57 | 50585 | 42 | 50543 | 2.84 | 1965351 | 5 | 0 | 5 | 176 | 111 | 7158701911 A |
| 2.57 | 50585 | 42 | 50543 | 2.83 | 1965351 | 7 | 0 | 7 | 247 | 110 | 7158701429 A |
| 2.57 | 50585 | 42 | 50543 | 2.79 | 1965351 | 5 | 0 | 5 | 179 | 109 | 7158702368 A |
| 2.57 | 50585 | 42 | 50543 | 2.78 | 1965351 | 3 | 0 | 3 | 108 | 108 | 7158703550 A |
| 2.57 | 50585 | 42 | 50543 | 2.7 | 1965351 | 1 | 0 | 1 | 37 | 105 | 7158704687 T |
| 2.57 | 50585 | 42 | 50543 | 2.67 | 1965351 | 4 | 0 | 4 | 150 | 104 | 7158700712 A |
| 2.57 | 50585 | 42 | 50543 | 2.63 | 1965351 | 3 | 0 | 3 | 114 | 102 | 7158702266 T |
| 2.57 | 50585 | 42 | 50543 | 2.56 | 1965351 | 2 | 0 | 2 | 78 | 100 | 7158701514 A |
| 2.57 | 50585 | 42 | 50543 | 2.53 | 1965351 | 2 | 0 | 2 | 79 | 98 | 7158703413 A |
| 2.57 | 50585 | 42 | 50543 | 2.53 | 1965351 | 2 | 0 | 2 | 79 | 98 | 7158701225 A |
| 2.57 | 50585 | 42 | 50543 | 2.5 | 1965351 | 1 | 0 | 1 | 40 | 97 | 7158704273 T |
| 2.57 | 50585 | 42 | 50543 | 2.42 | 1965351 | 15 | 0 | 15 | 620 | 94 | 7158703080 A |
| 2.57 | 50585 | 42 | 50543 | 2.27 | 1965351 | 1 | 0 | 1 | 44 | 88 | 7158701310 A |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7158704300 A | 84 | 92 | 2 | 0 | 2 | 2.17 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701559 A | 83 | 94 | 2 | 0 | 2 | 2.13 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700997 A | 81 | 1935 | 40 | 0 | 40 | 2.07 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700003 A | 80 | 3765 | 77 | 2 | 75 | 2.05 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158704483 A | 76 | 51 | 1 | 0 | 1 | 1.96 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702220 T | 76 | 51 | 1 | 0 | 1 | 1.96 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700213 A | 75 | 568 | 11 | 0 | 11 | 1.94 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700502 A | 75 | 52 | 1 | 0 | 1 | 1.92 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702900 T | 72 | 54 | 1 | 0 | 1 | 1.85 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701520 A | 70 | 111 | 2 | 0 | 2 | 1.8 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700207 A | 68 | 567 | 10 | 0 | 10 | 1.76 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701543 A | 66 | 118 | 2 | 0 | 2 | 1.69 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701181 T | 66 | 59 | 1 | 0 | 1 | 1.69 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701175 A | 66 | 59 | 1 | 0 | 1 | 1.69 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702056 T | 64 | 121 | 2 | 0 | 2 | 1.65 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702526 A | 61 | 64 | 1 | 0 | 1 | 1.56 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158704034 A | 60 | 65 | 1 | 0 | 1 | 1.54 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700808 A | 58 | 399 | 6 | 0 | 6 | 1.5 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703392 A | 58 | 268 | 4 | 0 | 4 | 1.49 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701464 T | 55 | 141 | 2 | 0 | 2 | 1.42 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700974 T | 53 | 73 | 1 | 0 | 1 | 1.37 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703176 A | 52 | 75 | 1 | 0 | 1 | 1.33 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700344 A | 51 | 605 | 8 | 0 | 8 | 1.32 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702112 T | 47 | 82 | 1 | 0 | 1 | 1.22 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703182 A | 44 | 89 | 1 | 0 | 1 | 1.12 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700909 A | 40 | 97 | 1 | 0 | 1 | 1.03 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700309 A | 37 | 748 | 7 | 0 | 7 | 0.94 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701934 A | 32 | 121 | 1 | 0 | 1 | 0.83 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701940 A | 27 | 144 | 1 | 0 | 1 | 0.69 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702237 A | 25 | 160 | 1 | 0 | 1 | 0.63 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158703596 A | 18 | 448 | 2 | 0 | 2 | 0.45 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158706012 A | 0 | 2 | 0 | 0 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158706006 A | 0 | 2 | 0 | 0 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158705913 A | 0 | 1 | 0 | 0 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 6 | 0 | 7158705886 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 2 | 0 | 7158705828 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 1 | 0 | 7158705790 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 4 | 0 | 7158705761 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 2 | 0 | 7158705732 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 6 | 0 | 7158705726 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 1 | 0 | 7158705703 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 1 | 0 | 7158705699 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 13 | 0 | 7158705676 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 18 | 0 | 7158705667 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 69 | 0 | 7158705653 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 3 | 0 | 7158705647 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 7 | 0 | 7158705601 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 2 | 0 | 7158705597 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 17 | 0 | 7158705551 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 21 | 0 | 7158705539 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 3 | 0 | 7158705522 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 3 | 0 | 7158705516 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 3 | 0 | 7158705502 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 1 | 0 | 7158705495 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 2 | 0 | 7158705489 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 8 | 0 | 7158705466 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 2 | 0 | 7158705443 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 11 | 0 | 7158705370 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 7 | 0 | 7158705358 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 2 | 0 | 7158705335 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 4 | 0 | 7158705312 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 1 | 0 | 7158705306 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 7 | 0 | 7158705285 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 1 | 0 | 7158705279 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 7 | 0 | 7158705262 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 6 | 0 | 7158705256 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 2 | 0 | 7158705227 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 30 | 0 | 7158705210 A |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 6 | 0 | 7158705204 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 17 | 0 | 7158705183 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 8 | 0 | 7158705177 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 19 | 0 | 7158705160 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 13 | 0 | 7158705154 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 1 | 0 | 7158705148 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 11 | 0 | 7158705081 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 6 | 0 | 7158705075 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 8 | 0 | 7158705069 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 6 | 0 | 7158705052 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 32 | 0 | 7158705046 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 3 | 0 | 7158704999 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 4 | 0 | 7158704953 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 10 | 0 | 7158704947 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 24 | 0 | 7158704930 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 27 | 0 | 7158704924 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 1 | 0 | 7158704901 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 2 | 0 | 7158704880 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 4 | 0 | 7158704868 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 11 | 0 | 7158704845 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 3 | 0 | 7158704839 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 1 | 0 | 7158704816 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 15 | 0 | 7158704795 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 4 | 0 | 7158704789 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 23 | 0 | 7158704772 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 34 | 0 | 7158704714 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 59 | 0 | 7158704708 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 22 | 0 | 7158704670 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 12 | 0 | 7158704664 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 4 | 0 | 7158704641 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 1 | 0 | 7158704629 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 22 | 0 | 7158704612 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 39 | 0 | 7158704606 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 5 | 0 | 7158704591 T |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 10 | 0 | 7158704585 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 10 | 0 | 7158704579 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 24 | 0 | 7158704562 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 13 | 0 | 7158704556 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 3 | 0 | 7158704543 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 11 | 0 | 7158704533 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 40 | 0 | 7158704510 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 94 | 0 | 7158704504 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 14 | 0 | 7158704495 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 25 | 0 | 7158704477 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 19 | 0 | 7158704460 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 119 | 0 | 7158704454 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 8 | 0 | 7158704425 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 6 | 0 | 7158704419 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 10 | 0 | 7158704381 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 8 | 0 | 7158704375 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 5 | 0 | 7158704369 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 58 | 0 | 7158704346 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 3 | 0 | 7158704330 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 21 | 0 | 7158704323 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 31 | 0 | 7158704296 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 30 | 0 | 7158704267 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 4 | 0 | 7158704250 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 4 | 0 | 7158704244 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 6 | 0 | 7158704238 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 1 | 0 | 7158704221 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 36 | 0 | 7158704209 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 1 | 0 | 7158704194 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 1 | 0 | 7158704159 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 1 | 0 | 7158704142 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 10 | 0 | 7158704136 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 7 | 0 | 7158704127 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 27 | 0 | 7158704086 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 11 | 0 | 7158704063 T |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7158704040 A | 0 | 15 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158704028 A | 0 | 8 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703987 T | 0 | 43 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703964 T | 0 | 26 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703958 A | 0 | 8 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703879 T | 0 | 2 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703845 A | 0 | 12 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703833 A | 0 | 26 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703810 T | 0 | 24 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703804 T | 0 | 21 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703783 T | 0 | 3 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703760 T | 0 | 10 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703748 A | 0 | 224 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703731 A | 0 | 35 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703702 T | 0 | 41 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703698 T | 0 | 2 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703681 T | 0 | 2 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703675 T | 0 | 2 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703617 A | 0 | 24 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703584 T | 0 | 19 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703573 A | 0 | 29 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703544 A | 0 | 27 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703538 A | 0 | 1 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703515 A | 0 | 26 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703488 T | 0 | 4 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703471 T | 0 | 1 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703459 T | 0 | 24 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703442 T | 0 | 1 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703436 A | 0 | 67 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703429 T | 0 | 2 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703407 T | 0 | 4 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703386 T | 0 | 6 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703340 A | 0 | 152 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |
| 7158703311 T | 0 | 8 | 0 | 0 | 0 | 1965351 | 0 | 50543 | 42 | 50585 | 2.57 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 42 | 0 | 7158703305 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 5 | 0 | 7158703284 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 56 | 0 | 7158703261 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 12 | 0 | 7158703255 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 4 | 0 | 7158703232 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 10 | 0 | 7158703216 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 15 | 0 | 7158703199 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 88 | 0 | 7158703168 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 2 | 0 | 7158703147 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 11 | 0 | 7158703051 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 21 | 0 | 7158703045 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 42 | 0 | 7158703039 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 8 | 0 | 7158703022 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 65 | 0 | 7158703003 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 33 | 0 | 7158702998 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 10 | 0 | 7158702946 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 30 | 0 | 7158702934 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 4 | 0 | 7158702917 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 5 | 0 | 7158702896 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 29 | 0 | 7158702838 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 2 | 0 | 7158702815 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 26 | 0 | 7158702809 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 23 | 0 | 7158702759 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 5 | 0 | 7158702742 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 44 | 0 | 7158702663 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 4 | 0 | 7158702578 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 7 | 0 | 7158702549 A |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 15 | 0 | 7158702532 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 1 | 0 | 7158702476 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 9 | 0 | 7158702460 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 17 | 0 | 7158702424 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 69 | 0 | 7158702339 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 2 | 0 | 7158702289 T |
| 2.57 | 50585 | 42 | 50543 | 1965351 | 0 | 0 | 0 | 8 | 0 | 7158702272 T |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7158702243 T | 0 | 5 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702208 T | 0 | 2 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702187 T | 0 | 14 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702091 T | 0 | 16 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158702010 A | 0 | 3 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701975 A | 0 | 103 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701884 A | 0 | 23 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701849 A | 0 | 13 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701776 A | 0 | 12 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701730 A | 0 | 23 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701651 T | 0 | 3 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701639 A | 0 | 59 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701566 A | 0 | 13 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701470 A | 0 | 40 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701435 A | 0 | 93 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701346 T | 0 | 23 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701333 A | 0 | 38 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158701231 A | 0 | 3 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700872 A | 0 | 22 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700820 A | 0 | 46 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700583 A | 0 | 15 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700560 A | 0 | 16 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700531 A | 0 | 1 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700519 A | 0 | 12 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |
| 7158700498 A | 0 | 3 | 0 | 0 | 1965351 | 50543 | 42 | 50585 | 2.57 |

Report Summary:

Report Run: August 8 2022

Output Options: Data includes Lender loan types with between 1 and 9999999 total originations and  between 0 and 9999999 total current defaults & claims and  between 0 and 9999999 compare ratio  in the United States.

Loan Type(s): All Loans except streamline refinances

Michael A. Hirst (CA Bar No. 131034)
michael.hirst@hirstlawgroup.com
Marisela Bernal (CA Bar No. 329589)
marisela.bernal@hirstlawgroup.com
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, California 95616
P - (530) 756-7700
F - (530) 756-7707

D. Maimon Kirschenbaum (NY Bar No. 4387361)
maimon@jk-llp.com
Leah M. Seliger (NY Bar No. 4201224)
leah@jk-llp.com
JOSEPH & KIRSCHENBAUM LLP
32 Broadway Suite 601
New York, NY 10004
Phone: (212) 688-5640
Fax:    (212) 688-2548

Counsel for Plaintiff-Relator
William Schaffer

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. WILLIAM SCHAFFER, | **Civil Action No:** |
| Plaintiffs, | **PROOF OF SERVICE** |
| v. | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| CARDINAL FINANCIAL COMPANY, LP, EQUITY SETTLEMENT SERVICES, INC., HOME QUALIFIED LLC, FRANK CAPOBIANCO, SAL RIZZOLO, RALPH DIBUGNARA, CHRISTOPHER DELISLE, and DOES 1–10, | |
| Defendants. | |

Proof of Service

**PROOF OF SERVICE**

I live in the County of Yolo, State of California. I am a citizen of the United States, over the age of eighteen (18) years, and not a party to the within action. My business address is Hirst Law Group, P.C., 200 B Street, Suite A, Davis, California, 95616.

On December 13, 2022, I served the following document(s), described as

1.      **Complaint and Jury Demand with Exhibits**

2.      **Statement of Material Evidence and Information with Exhibits**

as follows:

Hon. Merrick B. Garland
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530-0001

Hon. Phillip A. Talbert
United States Attorney
Colleen Kennedy, Esq.
Eastern District of California
Robert T. Matsui United States Courthouse
501 I Street, Suite 10-100
Sacramento, CA 95814

I placed a true and correct copy of the foregoing document(s) in a sealed envelope addressed to each interested party as set forth above. I placed each such envelope, with postage thereon fully prepaid, certified mail, and return receipt requested, for collection and mailing in one of the United States Post Offices located in Davis, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on this 13th day of December, 2022, in Davis, California.

/s/ Marisela Bernal
Marisela Bernal

Proof of Service